**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

JOHN D. ARWOOD, TOGETHER WASTE, INC., A.W. WASTE MANAGEMENT, INC., DUMPSTER.ME, LLC, DUMPSTER.ME OF WAKE COUNTY, LLC, PORTABLE TOILET RENTAL COMPANY, INC., ARWOOD WASTE, INC. and ARWOOD SITE SERVICES, INC.,

     Plaintiffs,

  v.

AW SITE SERVICES, LLC,

     Defendant.

—————————————————

AW SITE SERVICES, LLC,

     Counterclaim Plaintiff,

  v.

JOHN D. ARWOOD, TOGETHER WASTE, INC., A.W. WASTE MANAGEMENT, INC., DUMPSTER.ME, LLC, DUMPSTER.ME OF WAKE COUNTY, LLC, PORTABLE TOILET RENTAL COMPANY, INC., and ARWOOD WASTE, INC.,

     Counterclaim Defendants,

  and

STEVEN C. GOODE,

     Third-Party Defendant.

) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )

**C.A. No. 2019-0904-JRS**

## MEMORANDUM OPINION

Date Submitted:  December 17, 2021
Date Decided:  March 9, 2022
Corrected:  March 10, 2022
Amended:  March 24, 2022

Theodore A. Kittila, Esquire and James G. McMillan, III, Esquire of Halloran Farkas + Kittila LLP, Wilmington, Delaware, Attorneys for Plaintiffs and Counterclaim Defendants John D. Arwood, Together Waste, Inc., A.W. Waste Management, Inc., Dumpster.Me, LLC, Dumpster.Me of Wake County, LLC, Portable Toilet Rental Company, Inc., Arwood Waste, Inc., and Arwood Site Services, Inc.

Sidney S. Liebesman, Esquire and E. Chaney Hall, Esquire of Fox Rothschild LLP, Wilmington, Delaware; Leslie B. Spoltore, Esquire of Obermayer Rebmann Maxwell & Hippel LLP, Wilmington, Delaware; and Jordan D. Weiss, Esquire of Goodwin Proctor LLP, New York, New York, Attorneys for Defendant/Counterclaim Plaintiff AW Site Services, LLC.

John G. Harris, Esquire of Berger Harris LLP, Wilmington, Delaware, Attorney for Third-Party Defendant Steven C. Goode.

**SLIGHTS, Vice Chancellor**

Yogi Berra said, "You can observe a lot just by watching."[1]  The buyer in this post-closing fraud and breach of contract case apparently was not of this mindset as it approached the transaction at the heart of this dispute.  That buyer, Defendant/Counterclaim Plaintiff, AW Site Services, LLC ("AWS"), was as informed about the businesses it sought to acquire as any buyer could be.  The targets, waste disposal businesses founded and built by Plaintiff John D. Arwood, had not been prepared for sale when Arwood received AWS's expression of interest, and Arwood lacked the know-how or inclination to prepare financial records or to formulate useful valuations.  Consequently, AWS was forced to take on full responsibility for valuing the sellers' assets.  With no seller valuations, no seller financials, and no other datapoints in hand, AWS insisted upon, and was given, full and unfettered access to the businesses' raw financial and other records, including the personal finances of their owner, Arwood, so that it could value the businesses for itself and decide whether it wanted to acquire them.

Yet, when the businesses did not perform as AWS had hoped after the acquisition closed, it claimed fraud.  That claim found no support in the trial evidence.  Instead, the preponderance of evidence proved that, if this buyer did not

_____

[1] He would eventually write a book by that title.  Yogi Berra, *You Can Observe A Lot By Watching* (Wiley 2009).

1

appreciate the facts it now claims were fraudulently concealed from it, that incognizance was the product of its own reckless failure to observe what was right in front of it.

Arwood started in the waste business as a child collecting "aluminum cans and pop bottles" from the side of the road.[2] After decades of operating various waste disposal companies, Arwood ultimately built an online dumpster and portable toilet rental/brokerage platform that attracted the attention of potential buyers, including the private equity firm Broadtree Partners, LLC. But there was a problem. While Arwood had developed an attractive and successful business plan, he did not know how to package a business to be sold. Arwood had not valued his businesses; in fact, he did not maintain any financial records, and he did not know how to prepare them.

To address this problem, Broadtree dispatched Sean Mahon, a Broadtree Principal and Operating Partner, to perform extensive due diligence and, in the process, to prepare a detailed set of financials for the businesses Broadtree was interested in acquiring so that Broadtree, in turn, could share them with the fund's investors. Mahon's access to Arwood's business was extraordinary. Ultimately, he was able to prepare a set of financials that, in his view, and eventually in Broadtree's view, accurately reflected the value of the businesses Broadtree was to acquire.

---

[2] Tr. 708:21–709:4 (Arwood).

In doing so, Broadtree was able to drive down Arwood's unsubstantiated asking price by asserting that Arwood was drawing revenue from sources that Broadtree could not reliably replicate post-closing. Arwood acquiesced.

The acquisition was memorialized in an Asset Purchase Agreement dated October 19, 2018 ("APA"), and the consideration paid for all of the businesses AWS (Broadtree's acquisition vehicle) acquired was approximately $16 million in cash and equity. Arwood continued to work for AWS post-closing until the parties had a falling out and this litigation ensued.

The dispute began when Arwood complained that AWS and Broadtree had wrongfully refused to release approximately $1.41 million of the acquisition consideration that remained in escrow. AWS and Broadtree countered by maintaining that Arwood had somehow managed to defraud them, notwithstanding Mahon's intimate knowledge of the businesses pre-closing, by concealing a massive fraudulent billing scheme that caused a substantial overstatement of revenue. They asserted both an indemnification claim under the APA and a fraud claim for more than $11 million.

Arwood struck first in this Court, filing a complaint on November 8, 2019, in which he and the entities he sold bring claims against AWS for breach of contract, conversion, and tortious interference with contract. They also seek an award of specific performance of the APA that would require the buyers to release the funds

3

held in escrow. In response, AWS filed counterclaims against Arwood and the selling companies, as well as third-party claims against Arwood's former business partner, Steven Goode, alleging fraud, fraudulent inducement, breach of contract, and breach of the implied covenant of good faith and fair dealing. AWS seeks damages in excess of $9 million. The case has been tried and this is the Court's verdict.

After careful consideration, I am satisfied that Arwood and the selling companies have failed to prove any of their claims. As discussed below, the preponderance of the evidence reveals that Arwood and the entities he controls breached the APA by making inaccurate representations regarding the financial condition and lawful operations of the conveyed businesses, and AWS is entitled to retain the funds held in escrow and an award of damages up to the cap set in the APA. The reasonableness, or not, of AWS's reliance upon the sellers' representations is not a relevant consideration in assessing the *bona fides* of AWS's indemnification claim.

As for AWS's counterclaims, the fraud and fraudulent inducement claims fail. Broadtree and AWS were highly sophisticated, intelligent buyers. They knew Arwood was a decidedly unsophisticated seller. And they knew Arwood had opened the doors of his businesses to Mahon so that Mahon could determine how the businesses were run, what they were worth, and whether Broadtree wanted to buy

4

them. Arwood had no financials; he had not attempted to value his businesses; and he had made no presentations to Broadtree or any other potential buyers regarding the financial fitness of his businesses before Mahon began his extensive review. From Arwood's perspective—reasonable, in my view, given the evidence—Mahon and Broadtree knew as much about the businesses AWS was acquiring as he did. If Broadtree, Mahon and AWS did not know something about the sellers' businesses, then they were not watching during Mahon's weeks of observation. The preponderance of the evidence reveals that Arwood did not intentionally or recklessly induce AWS to buy his businesses, and AWS did not justifiably rely upon any false statements or omissions from the sellers.

On the other hand, as noted, the APA includes representations that the sellers had accurately represented their financial conditions and had lawfully conducted their businesses. The specious customer billing scheme that AWS points to in support of its claims was real and it renders certain of the seller's representations in the APA false. That constitutes a breach of contract and triggers the breach remedies set forth in the APA. Here, that means AWS may retain the funds held in escrow and may recover additional damages up to the contractually defined cap of $3.9 million.

Arwood and the selling companies, prompted by the Court's post-trial inquiry, have raised a sandbagging defense to AWS's breach of contract claim. They say the

5

buyers cannot rely upon representations in the APA to sue for breach of contract when they either knew pre-closing that the representations were false or were recklessly indifferent to their truth. After careful consideration, I disagree. In my view, Delaware is, or should be, a pro-sandbagging jurisdiction. The sandbagging defense is inconsistent with our profoundly contractarian predisposition. Even if Delaware were an anti-sandbagging jurisdiction, I am not satisfied that a buyer's reckless, as opposed to knowing, state of mind would trigger the doctrine in any event.

As for AWS's claims against Goode, they fail for lack of proof. The preponderance of the evidence reveals that he was an innocent, albeit ill-informed, facilitator and nothing more.

## I. BACKGROUND

Having weighed the evidence and evaluated the credibility of the witnesses, I find the following facts were proven by a preponderance of the evidence presented at trial.[3]

---

[3] Citations in the form of "PTO —" refer to the Joint Pre-Trial Stipulation and Order (D.I. 175). Citations in the form of "JX —" refer to joint exhibits in the trial record. Citations in the form of "Tr. — ([Last Name])" refer to the trial testimony of the identified witness. And citations in the form "[Last Name] Dep. —" refer to the deposition testimony of the identified witness as lodged with the Court.

## A. The Parties and Relevant Non-Parties

Plaintiff and Counterclaim Defendant, John D. Arwood, is a resident of the State of Florida.[4]  Arwood owned or co-owned several companies that comprised his waste management brokerage business (collectively, "Arwood Waste"), which had two primary focuses—rentable portable toilets and rentable roll-off dumpsters.[5]

With one exception,[6] the other Plaintiffs/Counterclaim Defendants are entities affiliated with Arwood or Arwood Waste that were sold to AWS.  They are: Together Waste, Inc.; A.W. Waste Management, Inc.; Dumpster.Me, LLC ("Dumpster.Me"); Dumpster.Me of Wake County, LLC ("Dumpster Wake"); Portable Toilet Rental Company, Inc.; and Arwood Waste, Inc (collectively, the "Selling Entities").  Third-Party Defendant, Steven Goode, owned Dumpster Wake and half of Dumpster.Me (the "Goode Entities").[7]

---

[4] PTO ¶ 35.

[5] PTO ¶¶ 36–37.

[6] Plaintiff, Arwood Site Services, Inc., was not a party to the transaction at issue here and is not a Counterclaim Defendant.

[7] PTO ¶ 32.

Defendant and Counterclaim Plaintiff, AWS, is a Delaware limited liability company with its principal place of business in Jacksonville, Florida.[8] Broadtree formed AWS to acquire and operate the assets of the Selling Entities.[9]

Several non-party fact witnesses testified at trial: (1) Sean Mahon, a "Principal and Operating Partner" of Broadtree and, after the closing, the Chief Executive Officer of AWS;[10] (2) Deb Robinson, who worked for Arwood Waste for approximately 14 years prior to the acquisition;[11] (3) Tiffany Henley, an independent contractor who performed fulfillment services for Arwood Waste and reported to Arwood prior to the acquisition;[12] and (4) Jason Hull, a "founder and shareholder of Broadtree."[13]

---

[8] PTO ¶ 29; Tr. 118:24–119:6 (Mahon) (explaining that most employees are located in Florida).

[9] PTO ¶ 70.

[10] PTO ¶ 30; *see also* PTO ¶ 28 ("Non-party Broadtree Partners, LLC ('Broadtree') holds itself out as 'a group of entrepreneurial investors focused on acquiring business where the owners are looking to transition from their current roles' and who 'specialize in providing opportunities for owners to smoothly exit their companies and seamlessly change leadership, while preserving their legacy.'").

[11] PTO ¶ 33

[12] PTO ¶¶ 34, 40

[13] PTO ¶ 31.

The parties each presented expert witnesses—Robert Wallace (AWS) and Darby Beard (Arwood)—to testify regarding the extent to which Arwood exploited certain questionable business practices to inflate customer bills.[14] AWS also presented expert testimony from Abraham Wyner, a statistician, to quantify the overbilling and to opine that the practice was routine, not random.[15]

Both parties also presented expert testimony regarding the damages purportedly suffered by AWS. On behalf of AWS, Gregory Cowhey testified that AWS suffered damages totaling about $9.7 million.[16] Arwood and the Selling Entities offered the expert testimony of Brett Margolin to rebut Cowhey's methodology and findings.[17]

## B. Arwood's Business

Arwood spent much of his youth cleaning up debris, scrapping metal, and hauling junk to make money.[18] The small jobs kept getting bigger and, by 2000,

---

[14] JX 283; JX 288.

[15] JX 285.

[16] JX 284.

[17] JX 293.

[18] Tr. 708:20–710:18 (Arwood) (explaining the different jobs in waste he worked in his youth).

9

Arwood had created a full-fledged waste management business.[19] Over the next twenty years, Arwood expanded his waste management business into various related sectors, such as renting portable toilets and roll-off dumpsters, hauling dumpsters to and from residential and commercial sites, and contracting for waste removal services for commercial customers.[20]

Arwood built his unique brokerage business model after he "got one of the first .coms," made a website for arwoodwaste.com, and then began "getting calls for stuff all over America."[21] As Arwood explained, "if somebody was on Google, Googling up [a] dumpster, . . . we were the only person out there."[22] Eventually, Arwood brought more than 900 websites within the Arwood Waste fold, all of which directed the customer back to Arwood's centralized brokerage operation.[23] As described in detail below, for a fee, Arwood Waste would then act as nationwide "middleman" between commercial and residential customers seeking to rent a

---

[19] *See* PTO ¶ 36.

[20] *Id.*

[21] Tr. 717:15–20, 718:8–13 (Arwood).

[22] *Id.*

[23] PTO ¶ 39.

dumpster or portable toilet and the local haulers and suppliers who would fill the orders.[24]

## 1. The Customer Order and Fulfillment Process

Arwood Waste's online brokerage business was operated from a physical location in Jacksonville, Florida. That location included a call center where Arwood Waste employees serviced customers, arranged haulers and processed orders.[25]

The company maintained its records and sales information through a system called "TRUX," a billing and dispatch software.[26] For dumpster orders, the TRUX platform managed the customer's order information, including the customer's contact information, billing information, the size of the dumpster, the location where the dumpster was to be delivered, and the category and volume of waste the customer would be placing in the dumpster.[27]

---

[24] PTO ¶ 40; Tr. 707:15–21, 708:4–19, 948:18–949:8 (Arwood) (describing the fulfillment process and how order information was processed). I focus mainly on the dumpster side of the Arwood Waste business going forward as this is the segment of the business where AWS alleges the wrongdoing occurred.

[25] Tr. 558:13–558:18 (Robinson) (explaining that employee responsibilities included answering phone calls, selling products and assisting customers).

[26] PTO ¶ 55; Tr. 562:18–23 (Robinson) (describing TRUX as "a Waste Management billing system and dispatch system"); Tr. 719:16–24 (Arwood) (describing the functionality of TRUX).

[27] Tr. 483:19–484:6 (Henley).

After the sales team onboarded a customer, that team would send the order to the fulfillment side of the business,[28] which focused on finding a local hauler to service the customer order.[29] The fulfillment team was managed by Tiffany Henley, an independent contractor who reported to Arwood.[30] Arwood Waste had a list of subcontracting haulers that it used regularly, and it would source new haulers as needed from the Yellow Pages and Google.[31] The fulfillment team would contact the haulers, obtain a quote, and schedule the dumpster delivery.[32] The hauler either required payment up front or invoiced Arwood Waste after completing the job.[33] All of this information was then keyed into the TRUX system.[34]

---

[28] Tr. 563:4–564:14 (Robinson); Tr. 481:19–23 (Henley) ("You get the order from sales, and you start locating a vendor that you will be able to use that works within the budget that we have, schedule that order with the hauler, and then make sure that it gets delivered.").

[29] Tr. 484:19–485:8 (Henley) (explaining the fulfillment process).

[30] PTO ¶¶ 34, 40; Tr. 482:21–23 (Henley).

[31] Tr. 484:19–24 (Henley).

[32] Tr. 485:1–9 (Henley).

[33] *Id.*

[34] Tr. 948:12–21 (Arwood) ("Then Tiffany [Henley] would also have access to that website that the orders are put on. She would go in and put the orders, you know, in—manually put the orders into TRUX. . . . And she basically copies and pastes everything out of the order form, puts it into TRUX. And then she reaches out to a hauler, schedules it, puts all the details in the notes of TRUX, you know, who the hauler is and what they charge and what they processed on the credit card.").

12

## 2. The Brokerage Billing Process

After a customer placed an order for a dumpster, and an Arwood employee entered the order information into TRUX, the system generated an invoice and charged the customer.[35] At the outset of the transaction, the customer was typically charged a rental fee and a hauling fee.[36] Often those fees would represent the entirety of the customer's financial commitment to Arwood Waste.[37] Frequently, however, the customer would owe more.[38] For example, most dumpster rentals would last ten days, but if the dumpster was not returned on time, the customer would be charged a late or "demurrage" fee.[39] Similarly, most rentals included a "tonnage cap," which was an allotted amount of weight a customer could deposit in the dumpster.[40] If a

---

[35] Tr. 515:17–516:2 (Henley).

[36] PTO ¶ 46.

[37] *Id.*

[38] Tr. 515:17–516:2 (Henley).

[39] PTO ¶¶ 46–47; Tr. 562:1–5 (Robinson) ("Q. And if he were to keep the dumpster for 11 days, what would happen? A. He would be charged a demurrage fee, which would be— at one time it was $7, and then it went to $25.").

[40] PTO ¶ 48.

13

dumpster was returned over the agreed upon tonnage cap, the customer would be charged an overage fee.[41]

Typically, the landfill receiving the waste would charge the hauler based on the weight inside the dumpster.[42] The landfill then issued the hauler a "dump ticket," which served as a receipt containing the weight and price.[43] The hauler, in turn, would provide the dump ticket to Arwood Waste with the expectation of reimbursement based on the landfill's charge.[44] That cost would then be passed on

---

[41] PTO ¶ 46; Tr. 484:7–14 (Henley) ("Q. And after a disposal is completed, how is—what's the process in TRUX for closing it out and issuing a bill? A. We call and get the disposal ticket from the hauler. They generally are given that once they take the contents to the landfill. Once we get that ticket, we enter it into TRUX as a disposal ticket. And then that generates any overages."); Tr. 565:2–20 (Robinson) (Q. "So the dumpster is picked up by a hauler. What did the hauler do with the dumpster next? A. They take it to the landfill in their city or state, have it weighed, empty it, take it back to their location, and they would send an invoice. Q. And what kind of information would be on that invoice? A. The address, a lot of times the contact name, the size of the dumpster, a lot of times the date it was delivered, the date it was picked up, and most times the weight.").

[42] Tr. 484:7–14 (Henley).

[43] Tr. 484:10–14 (Henley) ("We call and get the disposal ticket from the hauler. They generally are given that once they take the contents to the landfill. Once we get that ticket, we enter it into TRUX as a disposal ticket. And then that generates any overages.").

[44] PTO ¶ 50; Tr. 949:23–950:9 (Arwood) ("The hauler goes and removes the dumpster. And when they remove the dumpster, they are told, you know, the email, the receipt, or some kind of documentation. Let's just say they produced—they have a disposal ticket and they send it. It would go into the folder that—the remit that I mentioned at Arwood Waste, it would go there and get carbon-copied and went into Zendesk, where all invoices for all haulers would go to. So it was—the way I had it set up, it was open access to like, all employees.").

14

to the customer.[45] It was not unusual, however, for the hauler to seek reimbursement for an overage charge even though it had not provided the supporting dump ticket.[46] When that would happen, Arwood Waste would estimate the weights and charge the customer based on the estimate.[47]

On occasion, customers would complain when the overage fees were not properly documented, and sometimes they would refuse to pay the fees.[48] When a

---

[45] PTO ¶¶ 48–49; Tr. 486:8–24 (Henley) ("Q. All right. And when you get a dump ticket, how are customers—how should customers be charged with regard to the weight on the dump ticket? A. You should enter the amount that's on the dump ticket into the billing in TRUX. And it automatically generates what the overage should be, depending on how you've set it up. Q. Okay. . . . But if the weight on the dump ticket was below the allotted tonnage, should the customer be charged for any overages? A. No. The system wouldn't generate any overages if it was under the cap that's set up in TRUX."); Tr. 604:4–9 (Robinson) ("Q. Would Arwood Waste ever provide the customer with the total tonnage on the invoice or just if there was an overage? A. Just if there was an overage that they were billed for. That's all that showed on the invoice.").

[46] Tr. 565:17–20 (Robinson) ("Q. Would Arwood Waste receive dump tickets from haulers? A. On occasions we would but not always, no, sir."); Tr. 637:9–22 (Robinson) (testifying that haulers often billed for overages without supplying dump tickets).

[47] Tr. 775:22–776:5 (Arwood) ("There's always a challenge getting weight slips. So I had to come up with a way to measure, if we cannot get a weight or they won't tell us a weight. If it's construction debris or roofing, if it's—a 10-yard dumpster, for example, had, like, a one-ton cap. And if it was roofing, for example, I knew that that's heavier. If I couldn't get a weight ticket, then I would use this formula [to estimate the weight].").

[48] *See, e.g.*, JX 18; JX 31; JX 81; JX 150; JX 185.

15

customer did not pay, using a vendor, Arwood Waste routinely would place a mechanic's lien on the project for which the customer had rented the dumpster.[49]

## C. Arwood Connects with Broadtree Through Goode

Arwood met Goode around 2011.[50]  Goode had years of experience in the waste industry, including serving as president of a landfill business and as consultant for various waste removal clients large and small.[51]  In this latter capacity, he often facilitated acquisitions in the waste management space.[52]  Arwood's first business association with Goode occurred when he asked Goode to assist him with a bid to provide waste services to a military base in Fort Benning, Georgia.[53]  Later, Goode helped Arwood sell off portions of Arwood Waste.[54]

At the end of 2017, Arwood brought a business idea to Goode.[55]  Arwood "was generating a lot of leads and a lot of business," and he thought he and Goode

---

[49] Tr. 197:9–10 (Mahon); Tr. 493:18–22 (Henley).

[50] Tr. 18:20–19:3 (Goode).

[51] Tr. 18:21–20:6 (Goode).

[52] Tr. 19:16–20:6 (Goode).

[53] *Id.*

[54] Tr. 23:21–25:14 (Goode) (explaining the sales he facilitated for Arwood); Tr. 716:3–716:9 (Arwood) (same).

[55] Tr. 25:6–20 (Goode).

might be able to use those relationships to acquire a number of portable toilet companies.[56] The already existing brokerage platform could then feed business to the newly acquired companies. The idea was described as a "roll-up."[57]

In early 2018, Goode was put in contact with Sean Mahon while facilitating an unrelated sale of a transfer station.[58] As noted, Mahon is a principal of Broadtree,[59] which Mahon described as "a slightly more formalized version of a search fund."[60] After Broadtree determined that it was not interested in the transfer

---

[56] Tr. 26:6–11 (Goode).

[57] Tr. 106:1–4 (Goode); Tr. 25:15–26:15 (Goode) (explaining the roll-up idea).

[58] Tr. 27:23–28:15 (Goode); Tr. 186:9–18 (Mahon).

[59] PTO ¶ 28 ("Non-party Broadtree Partners, LLC ('Broadtree') holds itself out as 'a group of entrepreneurial investors focused on acquiring business where the owners are looking to transition from their current roles' and who 'specialize in providing opportunities for owners to smoothly exit their companies and seamlessly change leadership, while preserving their legacy.'"). Mahon's background is impressive—he studied economics at Princeton, worked for the financial services firm Lehman Brothers, went to business school at MIT Sloan, and then worked as an associate for McKinsey & Company prior to working for Broadtree. Tr. 246:9–247:15 (Mahon). In contrast, Arwood graduated high school and attended "a couple of classes" at college "through an apprenticeship program," but "never completed." Tr. 707:5–9 (Arwood).

[60] Tr. 244:14–245:3 (Mahon); Mahon Dep. Vol. I 30:25–31:11 ("A search fund is, the concept of a search fund is you have an individual, in this case myself, who finances a period of time known as the search phase, during which time that individual finds a company, which he or she will ultimately acquire and operate. Once that individual finds said company, that individual is in charge of finding the financing to secure the acquisition and then run all of the steps required, via its legal diligence, quality of earnings, to ultimately close on that transaction.").

17

station, Mahon inquired whether Goode might know of other investment opportunities.[61] When Goode mentioned Arwood's portable toilet roll-up idea, even though Mahon had no experience in the waste management industry,[62] he advised Goode that the opportunity was "much more aligned with what we were looking for."[63]

---

[61] Tr. 28:16–29:7 (Goode) ("Sean [Mahon] figured out pretty quickly [the transfer stations were] not what he and Broadtree were looking for. . . . [I]t had very little opportunity for growth. And he asked me then if I had any other projects. And that's when I told him about the portable toilet roll-up that John had.").

[62] Tr. 247:16–22 (Mahon) ("Q. Prior to working at AW Site Services, you did not have any experience in running a business, did you? A. Correct. Q. And you did not have any experience in waste management, did you? A. Correct.").

[63] Tr. 186:9–18 (Mahon) ("Q. How did you come to meet Mr. Goode? A. I met Mr. Goode—I had reached out to a transfer station in the Baltimore area. He was their representative, for lack of a better word. So when I spoke to Mr. Goode, we quickly figured out that that transfer station was not the type of opportunity we were looking for, but then he mentioned he had a brokerage business in the portable toilets base, and that was much more aligned with what we looking for."); Tr. 29:8–30:2 (Goode) (explaining that Mahon thought the roll-up "was kind of right up his alley with the experiences that he had and what he brought to the table"); Tr. 106:11–17 (Goode) ("[A]ll the discussions with Sean initially were all centered around the platform and the acquisition, the roll-up. I mean, the roll-up was the driver. The [brokerage] platform was just icing on the cake.").

18

## D. The April Letter of Intent and the Start of Due Diligence

After learning about Arwood Waste and the roll-up plan from Goode, Mahon expressed interest in acquiring Arwood Waste's portable toilet brokerage platform.[64] On April 2, 2018, Goode sent Mahon an email with the subject line "Portable Toilet Marketing Roll-up."[65] Attached to the email was a memorandum explaining the plan for the roll-up.[66] Goode also provided Mahon with spreadsheets summarizing the sales history of the portable toilet business, revenue, subcontractor costs, and employee costs that Arwood had extracted from TRUX.[67] Goode proposed a purchase price of $12 million, not based on any financial analysis he or Arwood performed, but because they "were shooting high" and this was their "dream price."[68]

On April 5, 2018, Mahon and Goode signed a letter of intent (the "April LOI") that summarized the terms by which Broadtree would acquire the "Arwood Portable

---

[64] PTO ¶ 62; Tr. 29:8–30:2 (Goode).

[65] JX 82; Tr. 30:16–24 (Goode).

[66] JX 82.

[67] Tr. 33:1–34:6 (Goode) (explaining that the contents of the email which were extracted from TRUX by Arwood); Tr. 188:9–16 (Mahon).

[68] Goode Dep. 49:22–24.

Toilet Marketing Platform and Call Center ex real-estate."[69]  The April LOI, prepared by Broadtree, expressly contemplated that the parties would "execute a roll-up of the portable toilet industry."[70]  The non-binding LOI proposed a value of $12 million, based on a run-rate revenue of approximately $3,254,166, a run-rate EBITDA of approximately $1,622,000, and an EBITDA multiple of approximately 7.5x.[71]

After the parties executed the April LOI, Mahon (and perhaps Hull) flew to Jacksonville where Goode introduced the Broadtree principal negotiators to Arwood.[72]  The parties discussed the industry generally and Arwood Waste's business specifically.  Following the meeting, Broadtree, through Mahon, began conducting extensive due diligence on Arwood Waste's portable toilet business,[73]

---

[69] PTO ¶ 63; JX 83; Tr. 35:6–36:8 (Goode) (describing the scope of the April LOI as including only the portable toilet platform).

[70] JX 83.

[71] JX 83; PTO ¶ 63; Tr. 36:22–37:5 (Goode); Tr. 188:5–189:3 (Mahon) (explaining that he prepared the LOI with Goode based on "extremely high-level P&L information" about "[t]he portable toilet piece of the business" to acquire it for "$12 million").

[72] Tr. 187:11–20 (Mahon) (describing the meeting); Mahon Dep. Vol. I 120:16–23 ("After we signed [the April LOI], I believe I flew down to Jacksonville, Florida.  I think Mr. Hull may have been with me.  That's when John showed me his QuickBooks files [and] prepared any TRUX reports he could at the time . . . .").

[73] PTO ¶¶ 63–65; Tr. 1011:2–20 (Hull).

which eventually expanded beyond that focus and lasted for six months.[74] Arwood gave Mahon open access to Arwood Waste's business records, billing software, and telecom accounts.[75] Additionally, Mahon had complete access to Arwood's business and personal bank records.[76] Goode's testimony highlights the unusual access Arwood granted Mahon from the outset of due diligence:

> Q. And if you know, how did Mr. Mahon get access to the information that he's referring to in this April 27, 2018, email, if you know?
>
> A. Well, I do know, because John [Arwood] told me that he had given Sean [Mahon] access to all his bank accounts, passwords into TRUX. And I remember asking him a question about that because I had never heard of that done. And I remember him telling me, well, you know— first of all, I think he said he thought Sean was maybe the smartest man he had ever met. And then, second, he said that he was going to be partners with them and he wanted them to look at everything, because he had nothing to hide.[77]

Importantly, Mahon and Broadtree were aware that Arwood Waste did not keep any formal financials whatsoever, had no official accounting system in place,

---

[74] PTO ¶ 64.

[75] PTO ¶ 65; Tr. 721:10–723:13 (Arwood) (explaining that he gave Mahon access to TRUX, all his business accounts, personal accounts, and credit cards because he "wanted [Mahon] to have access to everything").

[76] PTO ¶ 65; Tr. 721:10–723:13 (Arwood).

[77] Tr. 42:14–43:4 (Goode).

and used cash accounting.[78]  In fact, all concerned understood that Arwood was not sophisticated in the ways of finance and was not capable of preparing the kind of financial information Broadtree needed to value the businesses and decide whether to acquire them.[79]  To solve this problem, Arwood and others showed Mahon how to use TRUX so Mahon could access the company's billing, customer information and the general ledger.[80]  With unfettered access to all of Arwood Waste's financials, Mahon was able to build his own financial statements for the businesses.[81]

---

[78] Tr. 193:1–6 (Mahon) ("Arwood Waste did not have an accounting system.  They used cash accounting, so they prepared a P&L for tax purposes for all of his different entities commingled.  So we had to use the cash—the receipts of the business to build out the income statement."); Tr. 719:4–8 (Arwood) ("I didn't do financials or any of that type of stuff.  So I gave—we got talking, and we had to come up with a way for him to see what the business was worth.  I just knew what I was basically revenuing [sic]."); PTO ¶ 65.

[79] Tr. 1013:8–18 (Hull) ("The Court:  All right.  And did you have any sense at all whether Mr. Arwood was capable of preparing a financial statement based on your interactions with him and your understanding of his past experience?  A. Not without assistance, Your Honor. The Court:  All right.  So that was just not something he could do without either yours or Mr. Mahon's assistance?  A. Correct, Your Honor."); Tr. 719:4–8 (Arwood); Tr. 40:16–19 (Goode) ("Arwood didn't have income statements of P&L's or general— I mean, he had general ledgers.  So if there was an income statement, [Mahon] created it."); Tr. 259:4–22 (Mahon) (explaining that Broadtree had to build its own P&L statement using the data it sourced during Mahon's time on site); PTO ¶ 65.

[80] Tr. 125:16–19 (Mahon) ("Q. Who taught you?  A. John Arwood taught me how to use TRUX, Deb Robinson taught me, Tiffany Henley, and then TRUX also taught me."); Tr. 719:16–20 (Arwood) (explaining that he gave Mahon full, password-protected access to TRUX).

[81] Tr. 190:1–16 (Mahon) ("A.  With the view access to the bank accounts, I was able to tie the cash postings.  So the cash that he had recognized in TRUX as having received, I was able to tie that to the cash that went into his bank accounts, to verify the cash.  I, with his

22

## E. The May and June Letters of Intent

"[A]lmost immediately" upon reviewing Arwood Waste's data, Mahon discovered that the portable toilet component of the Arwood Waste business could not be "disaggregated" from the dumpster business because of poor record-keeping.[82] Accordingly, Mahon and Broadtree decided to acquire the entire brokerage business.[83] On May 3, 2018, informed by the financials that Mahon had created, Broadtree issued a second LOI (the "May LOI") to that effect.[84] The May LOI was based on the same 7.5x EBITDA multiple as the April LOI,[85] and set the enterprise value of the brokerage business at $20.9 million, assuming run-rate

---

credit cards, was able to categorize his spend based on the category of spend, be it subcontractor, advertising, travel and entertainment, or personnel expenses. And with the checks, I was also able to do that as well. So, effectively, take the receipts of the business and build up a P&L for the business. Q. How long did it take you to build the P&L? A. It took a very long time for us to build the P&L."); PTO ¶ 66; JX 89; Tr. 39:4–41:17 (Goode) (explaining that JX 89 was an "income statement [Mahon] created" because "Arwood didn't have income statements of P&L's or . . . general ledgers" and that Mahon was "pretty proud of what he had done").

[82] Tr. 190:22–191:1 (Mahon) ("[I]t became pretty obvious almost immediately that you would not be able to disaggregate the portable toilet business from the rest of the business.").

[83] PTO ¶ 68.

[84] JX 93; PTO ¶ 68.

[85] *See* PTO ¶ 68; Tr. 191:11–21 (Mahon).

23

revenue of $6,407,708 and run-rate EBITDA of $2,787,748.[86]  Mahon and Arwood

signed the May LOI on May 4, 2018.[87]

After the parties executed the May LOI, Mahon continued due diligence.

In the process, Mahon regularly communicated with his partners at Broadtree,

detailing his findings in emails and investor decks.[88]  He hired Elliott Davis, LLC,

an accounting firm, to do a "quality of earnings" report, or "QoE."[89]  Mahon's

purpose in commissioning the QoE was to have Elliot Davis validate whether

---

[86] JX 93; PTO ¶ 68.

[87] *Id.*

[88] *See* JX 97; JX 99; JX 102; JX 106; JX 107; Tr. 970:15–971:7 (Hull) ("I was assisting Mr. Mahon, Sean, in his diligence.  I would review what he was doing.  I would speak to Sean frequently. . . .  We would review documents.  We would review Sean's diligence and then facilitate a presentation of that information and of the opportunity to acquire the platform to the investors.").

[89] Tr. 192:2–17 (Mahon) ("A. After the second LOI was issued, we began the Q of E process with Elliott Davis and Mr. Arwood.  Q. Describe, what does Q of E mean?  A. Q of E stands for quality of earnings.  That's when you bring in an outside accounting firm to validate the P&L that has been proposed to make sure that the revenue was accounted for correctly, that the costs are accounted for correctly as well.  Q. And what was your involvement in that process?  A. In that process, my involvement primarily was to make sure Elliott Davis was able to get all of their—all of their questions answered by Mr. Arwood, to get them any of the information that they needed to validate the income statements."); Tr. 728:11–22 (Arwood) ("Q. At this point, the offer is—we looked at. It was $20,900,000.  Do you have an idea of what happened next after that point?  A. Not really.  I know he was working with, as mentioned in the trial, Elliott Davis.  I really don't know, except the end result—they come back with a lot lower offer.  He just said—when he come back with the lower offer, he said that there was revenue they couldn't guarantee. And he said something about he found another—he found another charge in my credit cards that was associated to some advertising."); *see* JX 132.

24

revenue and costs as reflected in Arwood Waste's data could be trusted.[90]  During the QoE process, Mahon, with the help of Arwood, provided Elliot Davis with all information the firm requested.[91]  Broadtree also performed legal diligence and began the process of drafting transaction documents.[92]

On June 14, 2018, the parties executed the third and final letter of intent (the "June LOI").[93]  Apparently as a result of negative information regarding expected revenue and costs uncovered during Mahon's ongoing due diligence, and the QoE process, the June LOI set a much lower purchase price, $15,750,000, based on reductions in revenue forecasts and run-rate EBITDA.[94]  The EBITDA multiplier

---

[90] Tr. 192:6–22 (Mahon) (explaining the quality of earnings process); Tr. 206:2–207:11 (Mahon) (explaining that they used the cash postings reports from TRUX, credit statements, checks and bank statements to validate income); Tr. 984:2–15 (Hull) (discussing QoE process).

[91] Tr. 206:10–12 (Mahon) ("Q. How was this report prepared?  A. This was prepared by Elliott Davis with the support and input of myself and Mr. Arwood."); Tr. 914:10–19 (Arwood) ("Q. You worked with Mr. Mahon to prepare the quality of earnings report with Elliott Davis as well; right?  A. Again, I didn't work with Elliott Davis.  I didn't know who they were until after the acquisition.  Or maybe they were brought up right before closing maybe.  I just never dealt with anybody there.  And me working with them, to be clear, was [Mahon] asking me questions.  I don't know about accounting stuff.").

[92] Tr. 203:22–204:2 (Mahon) ("A. After due diligence was completed, we began the legal diligence and document-drafting process.").

[93] PTO ¶ 69; JX 116.

[94] PTO ¶ 69; JX 116; Tr. 81:15–82:10 (Goode); Tr. 204:10–205:5 (Mahon) ("Q. How does it differ from the second letter of intent?  A. In this letter of intent, it's still for the entire brokerage business, but now the run-rate revenue is 6.2 million.  The run-rate EBITDA is

remained at 7.5x.[95]  Regarding the lower purchase price, Arwood testified that he "wasn't happy about it" and "didn't understand" it as he had no valuation of his own,[96] but he ultimately agreed to the lower price because he was excited about participating in the roll-up.[97]  Due diligence continued for another four months before the APA was executed.[98]

---

2.1 million.  The enterprise valuation is 15.75 million.  Q. Why were those changes made?  A. Through going—through looking at the revenue report, the cash postings report that we used—I'd mentioned previously that it was by customer.  With Mr. Arwood and Elliott Davis, we went through that report to categorize which customers were part of the brokerage business and which were part of his traditional hauling business.  And then we also found additional expenses for the brokerage business that were sitting in credit cards that originally were not part of the brokerage business."); Tr. 728:11–729:8 (Arwood) ("Q. At this point, the offer is—we looked at.  It was $20,900,000.  Do you have an idea of what happened next after that point?  A. Not really.  I know [Mahon] was working with, as mentioned in the trial, Elliott Davis.  I really don't know, except the end result—they come back with a lot lower offer.  He just said—when he come back with the lower offer, he said that there was revenue they couldn't guarantee.  And he said something about he found another—he found another charge in my credit cards that was associated to some advertising."); Tr. 940:4–17 (Arwood) (explaining that "when [Mahon] lowered the price and stuff, he was taking out stuff he couldn't account for").

[95] PTO ¶ 69.

[96] Tr. 959:1–5 (Arwood) (testifying that he did not have "any consultants or bankers or anyone else come in" and attempt to provide him with a valuation before negotiating with Mahon); Mahon Dep. Vol. I 162:14–163:13 (testifying that the financial statement he prepared "was the authority as far as I was concerned" but did not know if Arwood "had a P&L number" or "a valuation company").

[97] Tr. 728:23–729:3 (Arwood).  He was particularly excited to work with one of the partners in the roll-up, George Dean Johnson.  Arwood testified that he "was honored to be able to even work with that gentleman" and that "he ultimately agreed to lower the price primarily because he was excited by George Dean Johnson at that time." *Id.*; Tr. 727:1–3 (Arwood).

[98] PTO ¶ 70.

## F. Pre-APA Due Diligence Continues

As due diligence continued, Mahon and Broadtree had nearly unlimited access to Arwood's businesses, a product of the implicit trust Arwood placed in Mahon from early on in the process.[99] Broadtree populated and then hosted the "data room."[100] Arwood gave Mahon full access to both his personal and business banking information and credit card statements throughout.[101] In fact, he gave Mahon such unfiltered access to his bank accounts that he once sent his father with Mahon to the bank early in the diligence process, testifying that, having given Mahon "accountant-[level]" access, and since "we never done this [sic] before," "[w]e wanted to make sure that [Mahon] couldn't, like, steal money and stuff like that."[102]

To facilitate his review of internal company information, Arwood gave Mahon administrative credentials for TRUX and the other tools the company used

---

[99] Tr. 719:21–24 (Arwood) ("In my heart, I felt—I trusted him, so I let him get in there and pull all the reports he wanted to.").

[100] Tr. 1010:16–1011:1 (Hull).

[101] PTO ¶ 65; Tr. 189:16–22 (Mahon) (explaining his access to Arwood's "corporate bank account and his corporate credit cards," among other things); Tr. 206:21–207:3 (Mahon) (explaining he used credit card statements, checks and bank statements in preparing a report); Tr. 721:19–42 (Arwood) ("You know, he needed—he had to get—he needed the numbers, every number—whatever numbers he needed to evaluate the business. So I gave him access, of course, to TRUX. And then eventually I gave him accountant access to all my banking, personal and business.").

[102] Tr. 722:1–11 (Arwood).

to manage the business.[103]  In other words, Arwood "gave [Mahon] access to everything,"[104] with one exception—he asked that Mahon visit the call center after hours, as both parties recognized that it was best the employees did not know that Arwood was considering selling his business.[105]  Mahon communicated with Broadtree about his findings as his diligence progressed, and he prepared summaries in the form of investor decks for presentation at regular Broadtree meetings.[106]

As Mahon was creating the brokerage business financials, he noticed that, besides the portable toilet and roll-off dumpster revenue, Arwood Waste generated "a lot of miscellaneous/late fees," including "lien fees," but testified he did not

---

[103] Tr. 953:6–23 (Arwood) ("The access that I gave Sean was my admin credentials, which makes it where you're the, you know, the—you got full control.  And the reason I did that, Your Honor, is because, for example, in TRUX, if I—I didn't want nobody to know that I was selling my business.  So when I gave him full access to TRUX, he would go in there after hours, because I was, of course, working during the day in it.  He would go in there after hours and be logged in as me. . . .  Plus, I wanted him—by having my admin access, he could pull reports.  I mean, he basically could have shut my business off if he wanted to.  I'm just saying.  It was the highest level that I gave him on all the—on Paychex, Zendesk, TRUX, Vonage.").

[104] Tr. 724:11 (Arwood).

[105] Tr. 468:1–8 (Mahon) ("I was on-site on one or two occasions after 5:00 to see the call center, but not during peak hours to see the call center in action, because Mr. Arwood didn't want his employees to know that he was looking at potentially selling."); Tr. 970:18–22 (Hull) ("I would speak to Sean [Mahon] frequently.  I did travel down to Jacksonville to meet Mr. Arwood, Mr. Goode, and we also went into the call center after hours.").

[106] *See* JX 118; JX 120; JX 124; JX 129; JX 140.

28

understand the source of those fees "at the time."[107]  Notably, he did understand that some of the data he compiled did not include ancillary service charges such as overages, and understood that "overages [were] part of the pricing structure."[108]  And he knew that there was a "poor accounting system" in place with respect to cash flow.[109]

## G. The Asset Purchase Agreement

The APA, as drafted by Broadtree, was executed on October 19, 2018, by Arwood and Goode for the Selling Entities, and Mahon for AWS.[110]  Under the terms of the APA, AWS paid Arwood "aggregate consideration" of $16 million, including $13,500,000 in cash and $2,500,000 in junior preferred membership units in AWS's parent company.[111]  A total of $1.41 million of the purchase price was held in escrow, which included $1.26 million for indemnification obligations and $150,000 for working capital adjustments.[112]

---

[107] Tr. 197:3–198:8 (Mahon).

[108] Tr. 306:15–307:13, 308:11–16 (Mahon).

[109] Tr. 307:17–319:5 (Mahon).

[110] JX 182 ("APA"); PTO ¶ 70.

[111] PTO ¶ 71; APA § 2.4.

[112] APA §§ 1.1, 2.5(b), 2.6(b)(iii)–(iv), 7.2(h); PTO ¶ 71.  The APA also provided for a "Post-Closing Purchase Price Adjustment" that provided additional post-closing remedies not relevant here.  *See* APA § 2.5(b)(iv); PTO ¶ 72.

As is typical, the APA contained buyer and seller warranties. Relevant here, Arwood and the Selling Entities represented and warranted that their financial statements were accurate, all accounts receivable less than 120 days outstanding were valid and enforceable claims, the sellers had materially complied with the law and all employees were disclosed.[113] Relevant here, the APA required Arwood and Goode to indemnify AWS against Losses (as defined) due to: (i) any inaccuracy or breach of any representation or warranty and (ii) any failure to perform or breach of any covenant or agreement."[114] Importantly, the APA strictly limited Goode's representations to Dumpster.Me and Dumpster Wake, the only entities in the acquisition that he wholly or partially owned.[115]

On the same day the APA closed, Arwood and AWS agreed to a 24-month employment agreement whereby Arwood would serve as AWS's Chief Marketing Officer at an annual salary of $200,000 and as a director on AWS's board.[116] Arwood's employment agreement also provided for three weeks of paid vacation

---

[113] APA §§ 3.7, 3.9, 3.20, 3.22.

[114] APA § 7.2(a).

[115] APA §§ 3.29, 7.2(c)(iv).

[116] JX 181; PTO ¶¶ 80, 84.

30

and confirmed his participation in AWS's sponsored employee benefit plan on substantially the same terms offered to other AWS executives.[117]

## H. AWS Management Post-Closing

After the acquisition closed, Mahon served as AWS's Chief Executive Officer.[118] As to be expected, Mahon took several measures to tighten AWS's operations and accounting, including implementing processes to organize customer billing,[119] hiring new employees,[120] and putting a new accounting system in place.[121] Mahon "changed the way [employees] use TRUX" and acknowledged he had to fix "a lot of bad habits" of AWS's employees, including how they invoiced and input

---

[117] PTO ¶ 80.

[118] PTO ¶ 87.

[119] Tr. 237:4–238:20 (Mahon) (explaining that he rebuilt the customer billing process, updated how the company used Zendesk, created individual email accounts for each employee, and built out an accounts payable team).

[120] Tr. 203:6–13 (Mahon) ("Q. And what employees did you have to hire after closing? A. We had to hire several sales agents, a controller, an AP department to process invoices and pay haulers. We ended up having to build out the accounts receivables team as well and build out the support team . . . .").

[121] Tr. 215:4–8 (Mahon); Tr. 729:4–18 (Arwood).

reports into TRUX.[122]  Otherwise, the brokerage business operated as it did before the acquisition.[123]

In May of 2019, to save AWS money and enable it to hire more staff, Arwood voluntarily reduced his salary by half and resigned as Chief Marketing Officer.  He continued his association with AWS as a consultant.[124]

## I.  Issues Surface Post-Acquisition

The issues that ultimately sparked this litigation surfaced soon after closing. In August of 2019, Mahon noticed that "the profits of the business[] were materially lower than what we had anticipated pre-acquisition."[125]  Mahon also "heard rumors

---

[122] Tr. 344:15–17, 346:4–9 (Mahon).

[123] Tr. 121:15–125:13 (Mahon).

[124] PTO ¶ 88; Tr. 747:11–22 (Arwood) ("Well, in the board meetings, I'm hearing—you know, they are saying they are trying to hire more people and stuff.  And that point, I had just got all that money.  I'm, like, I don't need all this money, getting paid that much.  So I went to them and said, look, why don't I just cut my—we met at Bono's Bar-B-Q.  I said, why don't I just—I'm willing to cut my pay in half and be an independent contractor, do the same work—and I let him know you'd be saving, too, if you're paying me that way because you're not paying taxes, I mean, and I'll do my same stuff.").

[125] Tr. 134:17–19 (Mahon); Tr. 134:22–135:2 (Mahon) ("Well, first, I had to assess where the difference in profitability came from.  And we saw that our gross profit was about 44 percent, when we expected 54 percent.  And at that point, we looked to see where the revenue sources were different.").  Mahon was also concerned about the increase of employment costs. *See* JX 236 at 10 ("Half of the increase[] in operating expenses is due to officer salaries: Sean [Mahon], John [Arwood], and Anna [Watkins, the new controller]."); JX 239 at 1–3  ("This has me pretty stressed out unfortunately . . . .  Why have employment costs increased so much?  . . .  How long does J. Arwood's consulting contract extend?").

32

of fraudulent billing practices" from Robinson and Henley.[126]  Both circumstances

prompted Mahon to investigate.  Using TRUX, Mahon looked at "the revenue that

we recognized around tonnage overage while we were operating the business versus

pre-acquisition when [Arwood] was running the business."[127]  He then compared

dump tickets and revenues and determined there were substantial discrepancies pre-

and post-acquisition.[128]  This exercise caused Mahon to draw certain conclusions

about Arwood Waste's pre-acquisition practices that he believed inflated revenue

and decreased reported costs, as summarized below.

### 1.  The Overbilling of Weight Overage Fees

Mahon discovered that Arwood Waste charged excessive overage fees.  As

noted, if a customer's filled dumpster exceeded the tonnage cap, Arwood Waste

would charge an overage fee.[129]  Because haulers often did not provide dump tickets

that would reflect the details of the waste contained in the rented dumpsters upon

disposal,[130] Arwood admitted at trial that he "had to come up with a way to measure,

---

[126] Tr. 135:3–5, 24 (Mahon).  Mahon testified that Robinson and Henley told him "to be on the lookout for any overage weights that end in .88."  Tr. 143:15–16 (Mahon).

[127] Tr. 135:6–9 (Mahon).

[128] Tr. 143:22–144:2 (Mahon).

[129] *See, e.g.*, JX 9; JX 11; JX 12; JX 15; JX 22; JX 117; JX 134.

[130] Tr. 637:18–22 (Robinson).

if we cannot get a weight or they won't tell us a weight."[131]  To estimate dumpster weights in these circumstances, Arwood testified that he researched government sources, like the Federal Emergency Management Agency ("FEMA"), to obtain information about the weight of certain types of debris,[132] and then estimated the weights of particular rented dumpsters by referring to the type of debris the customer indicated would be placed in the dumpster at the outset of the transaction and multiplying that by the size of the dumpster.[133]  As it turns out, using this formula, many estimated weights happened to end in .88 regardless of the size of the load.[134]

---

[131] Tr. 775:22–777:17 (Arwood).  As AWS observes, Arwood's trial testimony regarding his weight estimation practices was not consistent with his sworn testimony at deposition. *See* Def./Countercl. Pl. AW Site Servs., LLC's Opening Post-Trial Br. ("DOB") (D.I. 197) at 13.  During his deposition, Arwood claimed he would not have estimated weights and that he did not know anything about the practice.  *See* Arwood Dep. 61:17–20, 64:25–65:11, 194:18–195:3.  When asked about his deposition at trial, Arwood testified that he "wasn't feeling good" that day and watched YouTube videos before the deposition that warned him that "attorneys will try to word stuff and trick you."  Tr. 771:1–17 (Arwood).  It appears he feigned ignorance of estimated weights to avoid being "trick[ed]."  As noted, he admitted at trial that he engaged in the practice rather extensively.

[132] Tr. 777:4–11 (Arwood) ("Q. Where did you come up with the concept of estimating weights?  A. Through research off the internet.  As mentioned in this litigation, FEMA, municipalities, I went off places that I trusted because they're run by the government.  And they had—they have a weight chart on there of what C&D could weigh versus roofing to concrete and so on.").

[133] Tr. 775:9–777:17 (Arwood).

[134] Tr. 776:15–777:17 (Arwood) (giving hypothetical weights for dumpsters for a construction and demolition project depending on dumpster size and explaining that he chose numbers ending in .88 because they were "easy for me to remember"); *see, e.g.*, JX 9 (email containing weights ending in .88); JX 22 (same); JX 117 (same).

According to Arwood, he informed Mahon of his use of estimates during the course of Mahon's due diligence.[135] In this regard, at least, Arwood's testimony was credible.

At trial, Arwood insisted that he did not estimate weights for overages if he had the actual weights,[136] but AWS introduced a handful of customer bills showing overages charged in excess of the actual weight reflected on dump tickets.[137] Arwood also maintained that he only estimated "if [he] had to say, 10% of the time,"[138] but here again, as discussed below, the preponderance of the evidence said otherwise.[139]

---

[135] Tr. 940:21–942:18 (Arwood) ("He asked me about how, you know, how we did the billing and so forth, and he asked about the—you know, what the charges were for disposal and how we billed the people. And I remember going into telling him about, you know, the weight charges . . . . He was asking what charges like that. He got into all the details like that. And overages would have been definitely one of them, because there's overages on roll-off dumpsters, you know. And from what I'm remembering, he told me on the overages, that was something that he couldn't rely on as revenue.").

[136] Tr. 777:18–20 (Arwood) ("Q. So with respect to the use of these numbers, would you use them if you had actual weights? A. No, sir.").

[137] *See, e.g.*, JX 48; JX 67; JX 77; JX 78.

[138] Tr. 779:9 (Arwood). As noted below, this testimony is rebutted by Wyner's expert report.

[139] *See* JX 285 (Wyner Report) at 3 (concluding Arwood Waste charged overages on nearly every transaction before the acquisition but overages "rapidly dropped to about 50%" after the acquisition).

Arwood Waste's employees had access to a template from which they could create dump tickets when haulers would not send their own.[140]  Robinson credibly testified that "if [Arwood] or myself didn't have a dump ticket, we had [that] template for one in the office that we could input the information."[141]  Henley, who had no first-hand knowledge of the practice,[142] testified that her understanding was that when a customer disputed the invoice, employees "would go back and create that false dump ticket to correlate to the invoice in TRUX."[143]  Robinson's understanding was that she was being instructed to overbill, although she admitted

---

[140] Tr. 578:2–581:10 (Robinson) (testifying "if he or myself didn't have a dump ticket, we had a template for one in the office that we could input the information"); Tr. 774:3–20 (Arwood) (testifying about use of template in another business he owned); *see, e.g.*, JX 16; JX 19; JX 20; JX 24; JX 25; JX 41; JX 56; JX 59; JX 125; JX 133; JX 164; JX 167; JX 185; JX 191; JX 192; JX 193; JX 195 (uses of template dump ticket).

[141] Tr. 578:2–581:10 (Robinson).

[142] Tr. 536:20–537:4 (Henley).  For clarity, I note that Henley had first-hand knowledge of Arwood asking employees to create dump tickets reflecting disposal weights, but not in response to a customer dispute.  *See* Tr. 489:19–23 (Henley) ("Q. Did Mr. Arwood ask you to create dump tickets reflecting disposal weights?  A. Yes.  In TRUX, to bill customers. Not a disposal ticket that's from a landfill, but the disposal ticket process in TRUX.").

[143] Tr. 549:19–20 (Henley).  According to Henley, Arwood never asked her to create fake dump tickets herself.  But she would use fake dump tickets to create customer bills. Tr. 490:23–3 (Henley) ("A. He never asked me to create a fake disposal ticket.  He asked me to bill the customer in TRUX.  Q. For an inaccurate weight?  A. I didn't know that necessarily.").

36

"that verbiage was never said."[144] For his part, Arwood denied that he told Robinson to overbill or ever implied that she should.[145]

The parties presented competing expert testimony regarding whether Arwood's practice of "estimating" overage weights was standard practice in the waste removal industry. Robert Wallace, AWS's industry expert, concluded that Arwood's practice of estimating weights was "the opposite of industry norms" and "grossly violate[d] industry practices."[146] He also doubted Arwood's contention that it was difficult to obtain dump tickets from haulers.[147] Even if estimating weights was permitted in the industry, Wallace opined that Arwood Waste lacked the

---

[144] Tr. 648:22–649:2 (Robinson).

[145] Tr. 766:7–20 (Arwood) ("Q. Did you ever tell employees that it was the policy of Arwood Waste or any of your companies to overbill customers? A. No, sir. Q. Ms. Robinson said it wasn't said in so many words; it was implied. Did you ever imply anything of the sort? A. No, sir."); Tr. 955:23–956:7 (Arwood) ("The Court: Did you authorize anyone to create internally within Arwood Waste a dump ticket in cases where the landfill had not issued a dump ticket? The Witness: No, sir. The Court: So to the extent that was happening, that was happening without your knowledge? Arwood: Yes, sir."). AWS refutes this testimony by pointing to one email chain involving Arwood where fake dump tickets were attached. *See* JX 13.

[146] JX 283 at 8.

[147] *Id.* at 11 ("Based on my waste industry experience, it is a common practice for any customer, including waste brokers, to request Dump Tickets from haulers. In my experience, haulers almost always comply, except for unusual and rare circumstances."); *id.* at 9 ("Although it is true that Mr. Arwood's businesses were dependent on outside contractors, his statement that it is difficult to obtain accurate weight measurements from landfills or dumps is false.").

37

necessary information to make an informed estimate and instead regularly charged customers based on "a mere guess."[148]

AWS also offered the expert opinion of Abraham Wyner to prove the regularity with which Arwood charged estimated overages.[149] Wyner's report analyzed an Excel spreadsheet, with data extracted from TRUX, containing approximately 9,750 pre-acquisition weight tickets dating from January 2017 through December 2019.[150] He concluded that "[b]efore the acquisition, almost every load had overage charges," whereas, "[a]t the time of the acquisition, that fraction rapidly dropped to about 50%."[151] "What the data suggests," he opined, "is that pre-acquisition inflated weights were regularly used and recorded in place of actual measurements and that post-acquisition, these practices were stopped."[152]

---

[148] *Id.* at 9 ("In order to estimate the weight of the material in a roll off container, one would need to know the materials that were placed in the roll off container, and how much material was placed in each roll off container, as well as several other factors.").

[149] Dr. Wyner holds a doctorate degree in statistics from Stanford University, and teaches statistics at the University of Pennsylvania.

[150] JX 285 at 2–3. I note that Arwood argues that Wyner "relied on unreliable data compilations prepared for the purposes of litigation by AWS's chief witness Sean Mahon." Pls.' Post-Trial Answering Br. ("PAB") (D.I. 205) at 27. Before trial, I rejected that argument and deemed the TRUX spreadsheet and Wyner testimony admissible. D.I. 135 (Mot. *in Limine* to Exclude Def.'s TRUX at Trial); D.I. 179 (denying the motion).

[151] JX 285 at 3.

[152] *Id.* at 4.

He also noted that, "[t]here is a huge and statistically significant tendency to repeat certain number patterns, most prominently '88.'"[153]  He later testified that when estimating, "it is scientific malpractice to include extra-significant digits" because it creates "the very strong impression [in the minds of customers] that either I'm an incredible estimator or I'm actually using weights."[154]

In response, Arwood and the Selling Entities proffered Darby Beard to rebut Wallace and Wyner's findings.  She observed that Arwood Waste's unique brokerage model created a dynamic where it lacked "leverage over the hauler to compel production of disposal tickets" because it "often paid for the hauling in advance,"[155] while other brokers have the power to "withhold[] payments while awaiting disposal tickets."[156]  Given that dynamic, she concluded that Arwood appropriately "relied upon information provided by the customer as to the type of debris and the size of the container" and then "us[ed] average tons per cubic yard for different debris types published by multiple government agencies" to estimate

---

[153] *Id.*

[154] Tr. 1185:4–5, 1186:15–17 (Wyner).

[155] JX 288 at 6.

[156] *Id.*

weights.[157]  When pressed, Beard was unable to explain or justify how Arwood's estimating methodology, if properly employed, would so frequently land on an estimated weight ending in .88.[158]

After carefully considering the competing expert opinions, and other evidence, I am satisfied the credible evidence reveals that estimating overage charges was not an industry-standard practice.  To the extent Arwood Waste's brokerage model made it uniquely difficult for it to obtain dump tickets from haulers, the answer was not to guess at estimates of overage weights and charge customers accordingly.[159]  Instead, the answer was either to change the model to provide more leverage to obtain actual dump tickets, or to advise customers that overage charges would be based on estimates and then explain the methodology.  Arwood Waste did neither.[160]  Instead, Arwood guessed at the overages and then systematically

---

[157] *Id.*; *see also id.* at 7 ("Based on this approach, I conclude that Mr. Arwood did not defraud customers, but in fact implemented a well thought out approach to ensure a fair and equitable billing methodology in the unique circumstances his business model created.").

[158] Tr. 1170:20 (Beard).

[159] As noted above, Beard's conclusion that Arwood's business model made obtaining dump tickets difficult is consistent with Arwood and Robinson's testimony.

[160] Arwood points to JX 49, "Terms and Conditions for Service," to argue that customers were alerted of this practice.  This argument fails.  That document states that "AW may increase the rates hereunder proportionately to adjust for any increase in [disposal and fuel costs] or any increases in transportation cost . . . .  Furthermore, customer agrees that

represented to customers that the weights had been carefully calculated to the hundredth decimal point. This practice was misleading and, as Wallace opined, "grossly violated industry practices."[161]

## 2. The Improper Lien Charges

Arwood Waste also improperly charged customers lien fees and placed unwarranted liens on their property. Mechanics' liens were filed "extremely quickly" when customers did not pay and customers were charged lien fees "even if [Arwood Waste] did not file a lien on the location."[162] And Arwood Waste would sometimes pursue mechanics' liens against residential customers for non-construction projects, even though such liens are appropriate only for construction-related projects.[163] Arwood Waste received several customer complaints about

---

AW may proportionately pass through to Customer increases in cost as a result of weights being higher than those estimated." JX 49 at 2. This language simply states that Arwood Waste may increase rates as costs increase and that it may charge an overage fee if the actual weight measured is higher than what is estimated. If anything, it suggests that the weights as billed were not estimated, but "actual."

[161] JX 283 at 8.

[162] Tr. 180:24–181:10 (Mahon); Tr. 493:18–494:12 (Henley). Mechanics' liens are "statutory liens that secure payment for labor or materials supplied in improving, repairing, or maintaining real property." *Mechanic's Lien*, Black's Law Dictionary (11th ed. 2019).

[163] Tr. 132:10–13 (Mahon) ("Q. Under what circumstances can AW not place a lien on a customer's property? A. If it's not a construction-related project."); Tr. 181:1–10 (Mahon) ("[Arwood] filed the liens extremely quickly. And on locations that—where you could not file a lien, such as someone having a barbecue in their house. Q. I believe you told us about

improper liens, often through attorneys and once through the Missouri Attorney General's office.[164]  Mahon knew that Arwood Waste booked revenue from lien fees and had access to the source of these fees during due diligence, but apparently failed to investigate or appreciate the improper practices associated with at least some of these fees.[165]

When asked if Arwood Waste pursued mechanics' liens even when state law did not allow them, Arwood testified that he used Nationwide Notice for liens, and entrusted that firm to obey applicable laws.[166]  To the extent an improper lien was placed on a customer's property, Arwood testified that Nationwide Notice would be

---

this a little bit yesterday, but remind me why you can't file a lien for a barbecue at someone's house?  A. A lien is for a construction-related project.  So you can only file it for construction-related projects."); JX 10 (complaint alleging "Arwood Waste and Demolition" filed an illegal lien against a residential tenant for lack of payment); JX 51 (letter from attorneys for residential customers setting forth several ways in which lien filed by Arwood Waste was in violation of the law); JX 127 (same).

[164] *See* JX 10; JX 27; JX 40; JX 51; JX 72; JX 74; JX 108; JX 127; JX 128.

[165] *See* Tr. 197:5–15 (Mahon) ("Q. What were the revenue sources of Arwood Waste at the time?  A. Portable toilets and roll-off dumpsters were the two main revenue sources. Q. And what about any other fees, any other charges to customers?  A. They also had a lot of miscellaneous/late fees; so NTO [Notice to Owner of intent to lien] and lien fees. Interest charges were a big piece of it too.  Q. What was your understanding of those additional fees as a revenue source?  A. I didn't have an understanding at the time.  I didn't know about the extent of that.").

[166] Tr. 887:10–14 (Arwood).

to blame.[167]  Once again, the evidence does not align with that view given Arwood

Waste's substantial control over the lien process.[168]

### 3.  The Hauler Payments

Mahon discovered that Arwood Waste had a practice of failing to pay haulers.

Henley testified that the payment of haulers was contingent on Arwood Waste's

receipt of payment from Arwood Waste customers,[169] but Arwood testified to the

contrary.[170]  Henley and Arwood also disagreed about whether Arwood's failure to

pay haulers led to soured relationships and ultimately suspended services.[171]

---

[167] Tr. 889:12–18 (Arwood) (describing litigation where "the end result was Nationwide messed up").

[168] *See* JX 108 (emailing Nationwide Notice to "remove the lien on this property" because the customer "is requiring more paperwork than we have"); JX 128 (complaint reporting that an employee from Arwood Waste "said that [the customer] owed them" and that "she would file a lien on my property"); JX 40 (complaint to Missouri Attorney General stating that, after a payment dispute, Arwood Waste refused to talk to customer's attorney and "filed a Notice of Intent to File a Mechanic's Lien"); JX 72 (letter from customer stating that Arwood Waste filed a lien after being "unwilling to discuss [a payment dispute] in good faith").

[169] Tr. 495:3–5 (Henley) ("Q. And was payment to haulers contingent on payment by the customer to Arwood Waste?  A. Yes.").

[170] Tr. 908:3–6 (Arwood) ("Q. If Arwood Waste didn't receive payment from its customer, it wouldn't pay the hauler; correct?  A. That's not true.").

[171] *Compare* Tr. 506:16–22 (Henley) ("Q. Ms. Henley, did the failure to pay hauler invoices have any impact on your ability to do your job?  A. We'd call a hauler to try to schedule new services for a new order.  They would tell us that we were unable to set up the new service because of past-due amounts on the account."), *with* Tr. 908:7–15 (Arwood) ("Q. At some point, Arwood Waste jeopardized its relationship with Waste Management

43

Henley's testimony is corroborated by the preponderance of the evidence, which establishes that Arwood Waste often failed to pay haulers and that these failures often had consequences to long-term relationships.[172] For example, Henley kept and distributed to the fulfillment team a list of haulers that the company could not use because of nonpayment.[173] Post-acquisition, AWS rebranded, in large part because of this issue.[174]

### 4. The Hidden Employee Expenses

Finally, Mahon discovered that certain employee costs were not accurately disclosed because Arwood neglected to inform Broadtree that his parents, at nominal cost, performed work that would have to be performed post-acquisition by two paid employees.[175] Arwood's mother paid invoices for the brokerage business on a part-

---

due to nonpayment; correct?  A. That's not true either.  Q. Arwood Waste didn't have a past-due balance with Waste Management?  A. They may have, but it never jeopardized their relationship.  I'm still working with them today.").

[172] *See, e.g.*, JX 33; JX 38; JX 247.

[173] Tr. 507:1–22 (Henley); JX 247.

[174] *E.g.*, Tr. 227:13–229:2 (Mahon) (explaining that the company rebranded due to issues with "haulers refusing to do business with us because we were affiliated with Arwood Waste").  AWS now operates under the name ASAP Site Services.  Tr. 227:13–19 (Mahon) ("Q. Mr. Mahon, what name does AW currently do business under?  A. ASAP Site Services.  Q. Who decided to operate the business under the name ASAP?  A. Ultimately, I and the board decided to.").

[175] JX 244 at 7.

time basis for $100 dollars a week,[176] and his father ran errands.[177]  In Mahon's view, the sellers misled AWS by not disclosing the breadth of the work performed by Arwood's parents or the likely costs to replace them post-acquisition.[178]

But AWS admits that Mrs. Arwood was disclosed as an employee.[179] Schedule 3.22(a)(i), which was created in connection with the APA, provides the list of sellers' employees.[180]  The list, entitled "Salaried Employees," is categorized by "Position/Title," and disclosed the salary in the column entitled "Annualized Salary."[181]  Pansy Arwood is the second employee identified on the list, just below John Arwood.[182]  Mahon knew that Arwood's mother worked for Arwood Waste,

---

[176] Tr. 743:24–744:8 (Arwood).

[177] Tr. 615:10–15 (Robinson) (describing his duties as "payroll," "mail" and "errands"); 744:11–19 (Arwood) (explaining his father's duties as "deposit[ing] checks into banks," reviewing Henley's time sheet, picking up lunch, "run[ing] errands," amounting to "[n]ot much of nothing").

[178] Tr. 202:13–203:19 (Mahon).

[179] DOB at 42.

[180] JX 303.

[181] *Id.*

[182] *Id.*

but purportedly did not "expect to have to hire an entire accounts payable department" in her absence.[183] That testimony was not credible.

Mahon did not know that Arwood's father worked for the business, as he was not listed in Schedule 3.22(a)(i).[184] As noted, Mr. Arwood occasionally ran errands, monitored payroll, deposited checks at the bank, reviewed the credit card statements, and sometimes picked up lunch for staff.[185] The credible evidence reveals Mr. Arwood served essentially as a volunteer, not an employee. AWS's contention that it "was forced to hire and pay new employees to replace" Arwood's father is simply not supported by the preponderance of the evidence.[186]

## J. Arwood's Removal and the Notice of Claims

According to Mahon, his post-acquisition findings prompted AWS to terminate Arwood's employment.[187] On October 17, 2019, AWS sent Arwood a

---

[183] Tr. 202:13–203:19 (Mahon).

[184] Tr. 202:18–22 (Mahon); APA § 3.22; JX 303.

[185] Tr. 511:22–512:2 (Henley) (testifying that "the only thing" she knew Arwood's father did was "review[] [her] account sheets and pa[y] [her] invoice"); Tr. 615:10–15 (Robinson) ("Q. Do you know what services [Arwood's father] performed for the company? A. Payroll. Q. Anything else? A. Payroll, mail. He ran errands. I mean, other than that, I don't really know."); 744:11–19 (Arwood) (explaining his father's duties as "deposit[ing] checks into banks," reviewing Henley's time sheet, picking up lunch, "run[ing] errands," amounting to "[n]ot much of nothing").

[186] DOB at 19.

[187] PTO ¶¶ 90–92; Tr. 223:12–18 (Mahon).

Notice of Termination for Cause.[188] Hull then phoned Arwood and read from a script informing Arwood that he was being terminated.[189] The next day, AWS sent Arwood a Notice of Claims in which it invoked the indemnification provisions in the APA,[190] asserting that Arwood was liable for "at least $11,800,000" based, in large part, on Arwood Waste's pre-acquisition fraudulent billing scheme that, in turn, caused AWS to overpay for the assets.[191] AWS then instructed the escrow agent not to release any of the funds held in escrow to Arwood.[192]

## K. Procedural History

In response to the Notice of Claims, Arwood and the Selling Entities filed a Verified Complaint in this court on November 8, 2019.[193] The Complaint comprises five counts. Count I seeks specific performance of the APA through an order requiring AWS to release the funds held in escrow.[194] Count II asserts breach of

---

[188] PTO ¶ 90; JX 243.

[189] JX 323; Tr. 756:20–757:13 (Arwood) (identifying JX 323 as the script that Hull read to him when he was terminated over the phone); Tr. 984:16–24 (Hull).

[190] JX 244; PTO ¶ 91.

[191] PTO ¶ 91; JX 244.

[192] PTO ¶ 93.

[193] Verified Compl. ("Compl") (D.I. 1); JX 332.

[194] Compl. ¶¶ 73–78.

contract against AWS for breaching the APA "by asserting false and unfounded indemnification claims."[195] Count III asserts that AWS converted certain accounts receivable.[196] Count IV asserts tortious interference with contractual relations against AWS for interfering with Arwood's right to collect certain accounts receivable owed him.[197] And Count V asserts that AWS breached Arwood's employment agreement by "failing to compensate Mr. Arwood for paid days off and for benefits, including family health insurance."[198]

AWS answered the Complaint and brought counterclaims against Arwood and the Selling Entities, and a third-party complaint against Goode.[199] AWS's counterclaim and third-party complaint comprise five counts.[200] Count I asserts a fraud claim against all Counterclaim Defendants.[201] Count II asserts a fraudulent

---

[195] Compl. ¶ 82.

[196] Compl. ¶¶ 84–87.

[197] Compl. ¶¶ 89–94.

[198] Compl. ¶ 98.

[199] Answer of Broadtree P'rs, LLC and AW Site Servs., LLC and Verified Countercl. and Third-Party Compl. of AW Site Servs., Inc. ("Countercls.") (D.I. 5); JX 333.

[200] *Id.*

[201] Countercls. ¶¶ 77–85.

inducement claim against all Counterclaim Defendants.[202] Count III asserts a breach of contract claim against all Defendants, and against Goode as third-party defendant.[203] Count IV asserts a breach of the implied covenant of good faith and fair dealing (the "implied covenant") against all Counterclaim Defendants and Goode.[204] And Count V asserts an unjust enrichment claim against all Counterclaim Defendants and Goode, although the parties later stipulated to dismiss that count.[205]

After dispositive motion practice did not dispose of the claims, counterclaims or third-party claims, the Court convened a five-day trial from April 19–23, 2021, and May 1, 2021.[206] With post-trial briefs in hand, the Court heard post-trial oral argument on September 22, 2021.[207] The Court then requested supplemental briefing on a discrete legal issue, which the parties supplied on December 17, 2021.[208] The matter was deemed submitted for decision on that date.

---

[202] Countercls. ¶¶ 86–90.

[203] Countercls. ¶¶ 91–97.

[204] Countercls. ¶¶ 98–102.

[205] Countercls. ¶¶ 103–07; D.I. 117.

[206] D.I. 186–91.

[207] D.I. 212.

[208] D.I. 216–17.

## II. ANALYSIS

I address the counterclaims first, as they have been the parties' primary focus throughout this litigation. For the reasons explained below, AWS has not proven fraud or breach of the implied covenant but has proven breach of contract. I then address Arwood and the Selling Entities' claims against AWS and conclude that they all fail for want of proof. I also determine that AWS has failed to prove its third-party claims against Goode. Finally, I address remedies and award $3.9 million in compensatory damages to AWS.

### A. Fraud and Fraudulent Inducement

In Delaware, "[t]he elements of fraud and fraudulent inducement are the same."[209] A plaintiff alleging common law fraud (or fraudulent inducement) must prove five *prima facie* elements: (1) a false representation, (2) that the defendant knew or believed the representation to be false or was recklessly indifferent as to its truth, (3) that the defendant intended to induce action, (4) that the plaintiff acted in justifiable reliance upon the representation, and (5) causally related damages.[210]

---

[209]*Maverick Therapeutics, Inc v. Harpoon Therapeutics, Inc.*, 2020 WL 1655948, at *26 (Del. Ch. Apr. 3, 2020).

[210] *Stephenson v. Capano Dev., Inc*., 462 A.2d 1069, 1074 (Del. 1983).

50

As explained below, AWS's trial proofs fall short of proving either the requisite scienter (elements (2) and (3)) or justifiable reliance (element (4)).

AWS argues that it has proven the first element of fraud—a false representation—by proving that Arwood (1) stayed silent when he had a duty to disclose his misguided billing practices pre-acquisition,[211] (2) provided information that created a false impression that Arwood Waste's success was legitimate,[212] and (3) failed to cure the false impression he had created.[213] In other words, AWS asserts that Arwood's misrepresentations were the product of concealment, not affirmative falsehood, in that he provided information that left the buyer with a falsely optimistic view of Arwood Waste's businesses and failed to correct that misimpression.[214] For

[211] DOB at 27; *see also Paron Cap. Mgmt., LLC v. Crombie*, 2012 WL 2045857, at *5 (Del. Ch. May 22, 2012) ("Fraud need not take the form of an overt misrepresentation; it also may occur through concealment of material facts, or by silence when there is a duty to speak."), *aff'd*, 62 A.3d 1223 (Del. 2013).

[212] DOB at 27–29; *see also Norton v. Poplos*, 443 A.2d 1, 5 (Del. 1982) ("[A]lthough a statement or assertion may be facially true, it may constitute an actionable misrepresentation if it causes a false impression as to the true state of affairs, and the actor fails to provide qualifying information to cure the mistaken belief.").

[213] DOB at 30–31; *see also Trascent Mgmt. Consulting, LLC v. Bouri*, 2018 WL 4293359, at *15 (Del. Ch. Sept. 10, 2018) ("One has a duty to speak to correct an omission 'in order to prevent statements actually made from being misleading.'") (quoting *Stephenson*, 462 A.2d at 1074).

[214] I note that AWS's counterclaim alleged fraud based on both contractual misrepresentations in the APA and Arwood's concealment of material facts pre-closing, whereas AWS focused only on pre-closing fraudulent concealment and a duty to speak in its post-trial briefing. *Compare* Countercls. ¶¶ 8–9 (identifying specific representations

51

purposes of analysis, I assume AWS has proven that certain aspects of Arwood

Waste's business, particularly its sources of revenue, were not overtly revealed in its

haphazardly-kept business records such that AWS has proven the first element of

fraud.[215]

## 1. Scienter

As a matter of Delaware law, fraud "require[s] a certain level of scienter on

the part of the defendant; a misrepresentation must be made either knowingly,

intentionally, or with reckless indifference to the truth."[216] The plaintiff must also

prove that the defendant *intended* to induce reliance.[217] In this regard, "[f]raud

---

and warranties sections in its fraud claim), *with* DOB at 27–31 (failing to discuss fraud with respect to any of the APA's reps and warranties). The failure to argue contractual fraud in its post-trial briefs raises the specter of waiver. *See Walker v. Williams*, 2016 WL 6555886, at *5 (Del. Ch. Nov. 4, 2016) (deeming matters not raised in post-trial briefs waived). Ultimately, regardless of whether the claim sounds in contractual fraud or extra-contractual fraud, as discussed below, AWS failed to prove Arwood possessed the requisite scienter for fraud or that AWS *justifiably* relied on Arwood's alleged misrepresentations.

[215] I assume adequate proof of a false representation for the sake of analysis. To be clear, however, as explained below, AWS has not proven that any false impression it may have developed with respect to revenue was the product of the seller's conscious effort to mislead.

[216] *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 143 (Del. Ch. 2004) (citation omitted); *In re Wayport, Inc. Litig.*, 76 A.3d 296, 326 (Del. Ch. 2013) ("Under Delaware law, *scienter* can be proven by establishing that the defendant acted with knowledge of the falsity of a statement or with reckless indifference to its truth.").

[217] *Stephenson*, 462 A.2d at 1074.

depends on a subjective test. The defendant must be shown to have had a culpable state of mind."[218] And a culpable state of mind requires proof beyond negligence:

> Fraud may be said to be an action of a more affirmative evil nature, such as proceeding or acting dishonestly, intentionally, and deliberatively, with a wicked motive, to cheat or deceive one party to a transaction with respect to the situation or operations, or such as an action that results to his or her damage or loss and to the advantage or gain of the other party.[219]

"Whether the defendant had the necessary state of mind to support liability for fraud is ordinarily a question for the [factfinder]."[220] Although AWS was not required to "produce direct evidence of the defendant's state of mind," and could, instead, rely on "[c]ircumstantial evidence" to prove the point,[221] as discussed below, the preponderance of the circumstantial evidence presented in this case falls well short of supporting a finding that Arwood acted with the requisite scienter for fraud.

---

[218] Restatement (Third) of Torts: Liab. for Econ. Harm § 10 cmt. a (2020).

[219] 37 Am. Jur. 2d *Fraud and Deceit* § 3 (Feb. 2022 Update).

[220] Restatement (Third) of Torts: Liab. for Econ. Harm § 10 cmt. d (2020).

[221] *Deloitte LLP v. Flanagan*, 2009 WL 5200657, at *8 (Del. Ch. Dec. 29, 2009) (citing *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir. 1979)); *see also Maverick Therapeutics*, 2020 WL 1655948, at *29 ("Such *scienter* may be demonstrated through circumstantial evidence, including demonstrating motive and opportunity for the inducement. In cases where a fraud claim centers on a transaction, the transaction itself may serve as both the motive and opportunity to commit the fraud."); *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *32 (Del. Ch. Dec. 3, 2018) ("Facts that establish motive and opportunity to commit common law fraud can also be used to establish *scienter*."); Restatement (Third) of Torts: Liab. for Econ. Harm § 10 cmt. d (2020) ("Scienter is often difficult to prove directly in a suit for fraud.").

*First*, the unique and extensive level of access Mahon and Broadtree were given—by Arwood—into Arwood Waste's operations does not support an inference that Arwood devised a "scheme [] reasonably calculated to deceive."[222] There is no credible evidence that Arwood refused to provide anything that Mahon or Broadtree requested in due diligence. Indeed, Mahon and Broadtree were denied access only to the Arwood Waste employees, and that was by agreement of the parties to prevent unwanted disclosure that Arwood was looking to sell his brokerage business.[223] Arwood trusted Mahon and gave him unfettered, password-protected access to his personal and business banking information, credit card statements, TRUX records and more.[224]

This point is especially salient given that Arwood expected this acquisition to culminate in a "roll-up" in which he would participate post-acquisition, meaning that he planned to be business partners with Mahon and Broadtree after closing.[225]

---

[222] 37 C.J.S. *Fraud* § 42 (Feb. 2022 Update).

[223] Tr. 468:1–8 (Mahon) ("Arwood didn't want his employees to know that he was looking at potentially selling.").

[224] Tr. 719:21–24, 721:10–723:13, 953:12–23 (Arwood); Tr. 189:16–22, 206:21–207:3 (Mahon); Tr. 42:14–43:4 (Goode).

[225] Tr. 29:24–30:1 (Goode); JX 113 (Email from Mahon to Arwood and Goode with the subject line "Potential New Deal Structure and Overview of Roll-Up Structure"); Tr. 730:22–731:14 (Arwood) ("Q. And what was your understanding of what [JX 113]

Indeed, Arwood was paid partially in equity with this very point in mind.[226]  Given the access Arwood provided Mahon and his expectation that their business relationship would continue, it makes little sense that Arwood would intend to defraud Mahon and Broadtree only to be discovered post-closing.  Nor is it reasonable to conclude that Arwood was reckless in his representations given that he turned the keys of the business over to Mahon so that Mahon could ascertain for himself precisely what Broadtree was buying.

*Second*, and relatedly, although he had built a large waste business, Arwood was an alarmingly unsophisticated businessman.[227]  Remarkably, he did not track costs or keep a reliable profit and loss statement for the business, and he likely had no idea how to do so.[228]  This reality cannot be squared with AWS's allegations that

---

was?  A. Well, from what I was explained on how the roll-up and how I can make a lot of money, you know, I guess is how I understood it.").

[226] *See, e.g.*, JX 83 (April LOI) at 1 (stating that "together, we [meaning Arwood, Goode and Broadtree] will execute a successful roll up of the portable toilet industry"); *id.* (detailing Arwood's rollover equity "represent[ing] 40% ownership in the Company at close" and his post-closing employment as chief marketing officer).

[227] AWS argues Arwood was not unsophisticated because he had sold other parts of his business before.  I find this argument unpersuasive.  Arwood needed and utilized Goode's assistance to do the deals.  *See* Tr. 23:2–25:15 (Goode) (testifying that Arwood "needed some assistance" in making a bid and later asked Goode to help "facilitate" two sales).  And Arwood clearly had not done any deal comparable to this one.  *See* Tr. 722:1–11 (Arwood).

[228] Tr. 719:4–8 (Arwood); Tr. 259:4–16 (Mahon).

Arwood ran an extensive fraudulent scheme, that included giving Mahon password-protected access to the Selling Entities' finances and records, while successfully hiding that scheme from sophisticated businesspeople. Rather, it is more likely that Arwood, while understanding that he was engaging in certain untenable business practices, believed that Mahon and Broadtree knew how Arwood Waste was operating, including how it billed its customers to make money, and that they accepted those practices at the time they agreed to acquire the business from him.[229] This likely explains why Arwood did not balk when Broadtree reported that its offer had decreased significantly, as per the June LOI, because it could not verify or replicate certain revenue sources.[230]

*Third*, Arwood's behavior after the sale is not consistent with a seller who has just made off with a fraudulently attained payday. Instead of selling and running, Arwood continued to work with Mahon and AWS as Chief Marketing Officer.[231] After increased salary costs cut into the profitability of the new business, Arwood

---

[229] Tr. 940:21–942:18 (Arwood).

[230] PTO ¶ 69; JX 116; Tr. 81:15–82:10 (Goode); Tr. 204:10–205:5 (Mahon); Tr. 728:11–729:8, 940:4–17 (Arwood).

[231] PTO ¶ 87. In his new role, Arwood obtained new accounts for the business. *See* JX 220 at 9; JX 235 at 18; *cf.* JX 322.

voluntarily took a pay cut and stayed on as a consultant.[232]  There is no evidence that, before or after the acquisition, Arwood attempted to prevent Mahon or others from learning about Arwood Waste's past business practices by destroying evidence or otherwise secreting the purported fraud.  Indeed, as Arwood persuasively argues, the preponderance of the evidence shows that Arwood was legitimately surprised when he was terminated and accused of fraud.[233]

It is often difficult to discern precisely what is, or was, in the mind of an actor accused of fraud, which is why our law allows the factfinder to rely upon circumstantial evidence when determining whether sufficient proof of scienter exists in a fraud case.[234]  In some instances, a seller's motive to achieve a higher price, as revealed in the evidence, may alone support a fair inference of scienter.[235]  In this case, however, the substantial (and unusual) disparity in the business acumens of

---

[232] PTO ¶ 88; Tr. 747:5–748:4 (Arwood); JX 236 at 10.

[233] *See* Tr. 752:4–14 (Arwood); Pls.' Opening Post-Trial Br. ("POB") (D.I. 198) at 17–18.

[234] *E.g.*, *Maverick Therapeutics*, 2020 WL 1655948, at *29 (noting that "*scienter* may be demonstrated through circumstantial evidence").

[235] *E.g.*, *Great Hill Equity P'rs*, 2018 WL 6311829, at *32 ("Facts that establish motive and opportunity to commit common law fraud can also be used to establish *scienter*."); *Deloitte*, 2009 WL 5200657, at *8 ("Plaintiffs can establish scienter with facts establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior where they are plead [sic] with particularity and give rise to a strong inference of scienter.") (internal quotation marks and footnotes omitted).

buyer and seller, the unfettered and nearly total access given by seller to buyer, and the seller's post-closing commitment to the buyer to continue to work for newco, all support a finding that Arwood did not intend to mislead or induce Mahon or Broadtree, nor did he act recklessly in providing information to them pre-closing.

## 2. Justifiable Reliance

The fraud and fraudulent inducement claims also fail because AWS did not justifiably rely on Arwood's misrepresentations or omissions.[236] As noted, to prove fraud, the plaintiff must prove that his "action" was "taken in justifiable reliance

---

[236] I note that the failure to prove scienter is, alone, fatal to AWS's fraud claim, whether based on extra-contractual or contractual fraud. And, again, AWS did not press a contractual fraud claim in its post-trial briefs. With that said, there may be a basis to view justifiable reliance differently in the contractual fraud context, particularly given the express recognition in the APA that AWS was relying upon the seller representations and warranties. *See* APA § 4; *see also Agspring Holdco, LLC v. NGP X US Hldgs., L.P.*, 2020 WL 4355555, at *13 n.137 (Del. Ch. July 30, 2020) ("To be clear, no basis would exist to challenge Plaintiffs' reliance on the representations in the MIPCA, which expressly provides that Holdco has relied and would rely on those representations."). *But see Universal Enter. Gp., L.P. v. Duncan Petroleum Corp.*, 2013 WL 3353743, at *14–15 (Del. Ch. July 1, 2013) ("Although Universal proved that Duncan made knowingly false representations to induce Universal to enter into the Sale Agreement, Universal did not prove that it relied upon Duncan's false representations. . . . In the Sale Agreement, Universal bargained for an unfettered due diligence right. Universal then retained Delta and Manko Gold as its experts to conduct due diligence and evaluate the results. Through due diligence, Universal learned about [various problems] . . . Universal treated Duncan's representations with healthy skepticism. Universal relied on the representations in the sense that they contractually allocated to Duncan the risk that the representations would be incorrect, but Universal did not rely on the representations in the sense of being fraudulently induced by them to close the transaction."), *aff'd*, 99 A.3d 228 (Del. 2014) (TABLE). That issue has not been joined in the briefs, however, so I do not address it here.

upon the representation."[237]  "Under Delaware law, justifiable reliance is measured

objectively" and is determined as a matter of fact.[238]  Whether reliance was justified

is a contextual inquiry and "is judged by reference to the plaintiff's knowledge and

experience"[239] and "the relationship between the parties."[240]  In other words,

"[j]ustifiable reliance has a personalized character.  It is measured by reference to

the plaintiff's capabilities and knowledge; [and] a plaintiff's sophistication may

affect a court's judgments about what dangers were fairly considered obvious."[241]

---

[237] *Stephenson*, 462 A.2d at 1074; 37 C.J.S. *Fraud* § 51 (Feb. 2022 Update) ("The reliance must be justifiable or reasonable.").  Some jurisdictions use the term "reasonable reliance" instead of "justifiable reliance," or even draw a distinction between the two.  *See, e.g.*, 37 Am. Jur. 2d *Fraud and Deceit* § 231 (Feb. 2022 Update) ("Most courts have declared that the plaintiff must establish that the reliance on the misrepresentation was either reasonable or justifiable.  A minority of courts require the plaintiff to demonstrate that the reliance was both reasonable and justified.").  I need not distinguish between the two here because, in Delaware, "[r]easonable reliance is equivalent to justifiable reliance." *Reserves Dev. LLC v. Crystal Props., LLC*, 986 A.2d 362, 368 (Del. 2009).  *But see Great Hill Equity P'rs*, 2018 WL 6311829, at *33 ("This Court sometimes explicitly separates from justifiable reliance the requirement that reliance be reasonable.").

[238] *See Trascent Mgmt. Consulting*, 2018 WL 4293359, at *17; *Great Hill Equity P'rs*, 2018 WL 6311829, at *33 ("Whether reliance is justifiable is an objective standard."); 37 Am Jur. 2d *Fraud and Deceit* § 239 (Feb. 2022 Update) ("[T]he question of justifiable reliance is one of fact and requires an inquiry into the relationship between the parties.").

[239] 37 C.J.S. *Fraud* § 51 (Feb. 2022 Update).

[240] 37 Am. Jur. 2d *Fraud and Deceit* § 239 (Feb. 2022 Update).

[241] Restatement (Third) of Torts: Liab. for Econ. Harm § 11 cmt. d (2020); *see also* 37 C.J.S. *Fraud* § 51 (Feb. 2022 Update) ("[R]eliance is not justifiable where the alleged victim of a fraud ignored or closed its eyes to a known or obvious risk, particularly when the transaction is between large, sophisticated commercial enterprises with relevant

"One cannot secure redress for fraud where he or she acted in reliance on his or her own knowledge or judgment," and "not on the representor's statements."[242]

As just explained, it is axiomatic that a plaintiff does not justifiably rely on a defendant's misrepresentation if the plaintiff knows that the representation is false.[243] On the other hand, it is equally well-established that, generally, a failure to discover the fraud through due diligence does not excuse it;[244] in fact, "[a] plaintiff's diligence efforts can be evidence that her reliance on a false representation was reasonable because she made efforts to verify the representation and discovered no

---

experience."); *id.* ("Where ample opportunity existed to discover the truth, then reliance on a fraudulent misrepresentation of the defendant is not justified."); *Maverick Therapeutics,* 2020 WL 1655948, at *30 (explaining that if a party "should have discovered" the misrepresentation, "it did not justifiably rely").

[242] 37 C.J.S. *Fraud* § 60 (Feb. 2022 Update).

[243] *Ward v. Hildebrand*, 1996 WL 422336, at *4 (Del. Ch. July 8, 1996) ("[T]he recipient of a fraudulent misrepresentation is not justified in relying upon its truth if knows that it is false or if its falsity is obvious to him.") (citing Restatement (Second) of Torts § 541); *Maverick Therapeutics*, 2020 WL 1655948, at *30 (observing that if a defendant "shared [plaintiff's] understanding," "then it cannot have justifiably relied"); *Great Hill Equity P'rs*, 2018 WL 6311829, at *33 ("[T]he plaintiff must have actually relied.").

[244] *See, e.g.*, 37 Am. Jur. 2d *Fraud and Deceit* § 240 (Feb. 2022 Update) ("A party who has perpetrated a fraud through misrepresentations which induce action by another party cannot defeat a claim for damages by asserting that the defrauded party might have discovered the fraud by the exercise of proper care. However, the victim of a fraud cannot close their eyes to a known misrepresentation and cannot close their eyes to a misrepresentation that is obvious.").

60

reason to doubt its truth."[245]  Delaware law does not condone fraud, nor are buyers required to conduct perfect due diligence before their reliance can be said to be justified.

But reliance must have been "justifiable" in some sense of the word.[246]  This requirement "creates arguable tension with the usual rule that contributory negligence is no defense to an intentional-tort claim."[247]  Courts have struggled to draw a line somewhere between actual knowledge and negligence when assessing

---

[245] *Great Hill Equity P'rs*, 2018 WL 6311829, at *33; *see also id.* ("The fact that a plaintiff's diligence efforts do not uncover fraud does not render such efforts unreasonable, especially when the fraud was intentionally hidden.").

[246] *E.g.*, 37 C.J.S. *Fraud* § 51 (Feb. 2022 Update) ("The reliance must be justifiable or reasonable."); Restatement (Third) of Torts: Liab. for Econ. Harm § 11 cmt. d (2020) ("[L]iability does require a showing that the plaintiff's reliance on what the defendant said was 'justifiable.'  Justifiable reliance is an element of the plaintiff's cause of action . . . .").

[247] Restatement (Third) of Torts: Liab. for Econ. Harm § 11 cmt. d (2020).  *Compare*, *Great Hill Equity P'rs*, 2020 WL 948513, at *8 ("Great Hill was well aware of Plimus's business model which included the quality of the vendors, and thus could not establish justifiable reliance on any misrepresentation that may have been made regarding vendor quality."), *and Universal Enter. Gp.*, 2013 WL 3353743, at *14–15 (holding that unusually extensive pre-close due diligence foreclosed finding of justifiable reliance), *with Cobalt Operating, LLC v. James Crystal Enters., LLC*, 2007 WL 2142926, at *28 (Del. Ch. July 20, 2007) ("[I]t appears that Crystal's own efforts at deception prevented the fraud from being detected during due diligence.  Given these factors, and the other diligence Cobalt conducted, Cobalt satisfies its burden as a fraud plaintiff to show justifiable reliance."), *aff'd*, 945 A.2d 594 (Del. 2008) (TABLE), *and Janas v. Biedrzycki*, 2000 WL 33114354, at *5 (Del. Super. Ct. Oct. 26, 2000) ("Contributory negligence does not operate to reduce the liability under a theory of fraud.").

whether a buyer's reliance was reasonable or justified.  Judge Posner endeavored to

do so in *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.*, where he observed:

> That a more cautious buyer might not have relied, might have smelled a rat, does not defeat liability.  There is no defense of contributory negligence to an intentional tort, including fraud.
>
> This principle coexists uneasily, however, with a requirement that the victim of a fraud prove justifiable, or in other words reasonable, reliance, implying *some* duty of care on the part of the victim.  How are these principles—no duty of care (that is, no defense of contributory negligence) but a duty of *reasonable*, not just any old, reliance—to be reconciled? . . .  We think it comes down to this: while the victim of an ordinary accident is required to use the ordinary care of an average person . . . the victim of a deliberate fraud is barred only if he has notice of the fraud, and so he need only avoid *deliberate* or *reckless* risk-taking.
>
> These attenuated duties of care that a fraud victim has are two, not one.  The victim cannot close his eyes to a known risk.  But, beyond that— and the crux of the present case—he cannot close his eyes to a risk that is obvious, even if he does not himself perceive the risk.[248]

Pairing "recklessness" with knowing intent as a touchstone for justifiable

reliance makes good sense.[249]  It protects a buyer's reasonable reliance on due

---

[248] 896 F.2d 1035, 1041–42 (7th Cir. 1990) (emphasis in original).

[249] *Accord.* Restatement (Third) of Torts: Liab. for Econ. Harm § 11 cmt. d (2020) ("Justifiable reliance amounts to freedom from recklessness . . . ."); 75 Causes of Action 2d 119 § 10 (2016) (noting that courts must consider numerous factors "[i]n assessing whether reliance was justifiable or whether there was a reckless failure to exercise diligence"); *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035, 1041–42 (7th Cir. 1990); *Fed. Land Bank of Balt. v. Pusey*, 1986 WL 9041, at *3 (Del. Super. Ct. July 21, 1986) (couching argument of unjustifiable reliance in terms of recklessness); *Dexter Corp. v. Whittaker Corp.*, 926 F.2d 617, 620 (7th Cir. 1991) (using the phrase

diligence while also giving reverence to the word "justifiable." In this regard, it should not escape notice that equating a lack of "recklessness" with "justifiable" in the reliance context jibes with our law's acknowledgment that a knowing or reckless misrepresentation can give rise to fraud.[250] The symmetry is befitting—one can be held liable for fraud for acting with reckless indifference to the truth; and one can be denied a fraud recovery for acting with reckless indifference to the falsity of the representation or misimpression he alleges was fraudulently made or given.

With this symmetry in mind, AWS has failed to prove justifiable reliance because Mahon and Broadtree were, at the very least, reckless in any reliance they might claim upon Arwood's misleading omissions. This is not a case where a buyer simply failed to discover the hidden skeleton in the closet during due diligence. Rather, Mahon and Broadtree passed warning sign after warning sign as the information AWS now points to as the source of the fraud stared them in the face. The preponderance of the evidence reveals they either saw the evidence of improper

---

"reckless indifference to the truth" to describe behavior "that establishes unreasonable reliance in the law of fraud"). Black's Law Dictionary defines "recklessness" as "[c]onduct whereby the actor does not desire harmful consequence but nonetheless foresees the possibility and consciously takes the risk. Recklessness involves a greater degree of fault than negligence but a lesser degree of fault than intentional wrongdoing." *Recklessness*, Black's Law Dictionary (11th ed. 2019).

[250] *See Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000) ("It is well-settled under both Delaware law and the law of most other jurisdictions that the scienter [] requirement [for fraud] can be satisfied by a showing of recklessness.").

billing, improper lien practices and damaged vendor relationships and chose to ignore it, or they somehow missed what Arwood placed right before their eyes. Either way, any reliance they might now claim cannot be deemed justified.

*First*, to reiterate, Arwood gave Mahon and Broadtree unfettered access to his personal and business financials, as well as password-protected access to Arwood Waste's records and software.[251] He did this because he could not provide an accurate picture of the business that Broadtree was looking to buy. Broadtree was left to paint its own picture. At post-trial oral argument, counsel for AWS could not point to a single Delaware case where the court found that fraud had been proven even though the buyer knew the seller was not sophisticated enough accurately to depict the business he was selling, and I am aware of none.[252]

AWS argues that Mahon could not have known about the improper overages or lien practices, but the record does not bear this out. Indeed, although Mahon claims he was first alerted to the issue post-closing by the under-performance of the business and employee rumors, he investigated and confirmed the practice using data

---

[251] *E.g.*, Tr. 719:21–24, 953:18–23 (Arwood).

[252] Post-Trial Oral Arg. ("PT OA") (D.I. 212) at 97:22–98:18.

from TRUX, which he indisputably had full access to throughout diligence.[253] That information was always in Mahon's hands. Moreover, AWS's arguments regarding the pervasiveness of Arwood's "scheme" undercuts its contention that Mahon could not have discovered the scheme during the countless hours he spent rummaging through Arwood Waste' records.[254]

*Second*, and relatedly, Mahon and Broadtree knew early on that they could not trust Arwood Waste's financials (as they did not exist) nor the underlying data. Knowing they could not rely on the company's poor record keeping, they bought the brokerage business anyway.[255] Mahon relied heavily on TRUX in creating his reports, which he later dubbed the "authority," and yet he testified that he "had a very, very difficult time understanding" the software.[256] Basing the decision to buy

---

[253] Tr. 135:5–9 (Mahon) (testifying that he looked at TRUX to compare overage revenue recognized pre- and post-acquisition to investigate); Tr. 719:16–20 (Arwood) (explaining that he gave Mahon full, password-protected access to TRUX).

[254] *See* JX 285 (Wyner Report) at 3 (concluding that "[b]efore the acquisition, almost every load had overage charges"); *see also* 37 C.J.S. *Fraud* § 51 (Feb. 2022 Update) ("Where ample opportunity existed to discover the truth, then reliance on a fraudulent misrepresentation of the defendant is not justified."); *Maverick Therapeutics,* 2020 WL 1655948, at *30 (stating that if a party "should have discovered" the misrepresentation, "it did not justifiably rely").

[255] Tr. 193:1–6, 197:22–198:4, Tr. 258:1–13 (Mahon); Tr. 719:4–8, 943:16-18 (Arwood).

[256] Tr. 345:21–346:3 (Mahon); *see also* Tr. 190:1–16, 193:11–14, 206:2–207:11 (Mahon); Tr. 719:16–20, 953:6–23 (Arwood); Tr. 33:1–34:6 (Goode); JX 102.

a company on financials you know you cannot trust, drawn from data stored in software you do not understand, is not justifiable.[257]

*Third*, the fact that Broadtree substantially lowered the purchase price (by nearly 25%) after months of due diligence is strong evidence that Broadtree realized either that there were serious problems with the brokerage business or it could not fully trust the information it had in hand.[258] Broadtree contractually managed the risk that it had not painted an accurate picture of the brokerage business, after having been tasked with doing so, by substantially lowering the purchase price, securing seller's representations and warranties in the APA and then holding its breath. For purposes of fraud, that is not justifiable reliance.

---

[257] AWS's assertion that TRUX could not alert Mahon to Arwood's practices because "Trux does not contain documents or information sufficient to track customers" and "dump tickets are not stored in Trux" is not credible. *See* DOB at 11 n.2. As noted, Mahon confirmed the overage practice using TRUX. More to the point, he and Broadtree literally had to recreate the flow of cash in and out of the brokerage business to understand how the business they were buying made money. Given the pervasiveness of the overbilling and improper lien practices, it is not reasonable to conclude that evidence of these practices either was not seen or was seen but not understood.

[258] The May LOI was set at $20.9 million, and the June LOI was set at $15.75 million; PTO ¶¶ 68–69; JX 93; JX 116. In his deposition, Mahon identified certain additional costs that reduced the purchase price, but those costs do not fully account for the substantial decrease in the ultimate price paid for the businesses. *See* Mahon Dep. Vol. I 167:9–168:25. Both Arwood and Goode credibly testified that "there was revenue they couldn't guarantee" or "account for." Tr. 728:11–729:8 (Arwood); Tr. 940:4–17 (Arwood); *see also* Tr. 81:19–22 (Goode) ("The last letter of intent when they dropped the purchase price and [sic] he said there was revenue that he couldn't sustain and be guaranteed he would have, and he had added additional expenses.").

*Fourth*, although Mahon spent substantial time confirming Arwood Waste's revenue, he wholly ignored other aspects of the business. Besides the largest contract with the Florida prison system, Mahon did not ask for access to any customers or customer contracts even though this information was but a request away.[259] Importantly, he knew overage and liens fees were part of the revenue,[260] and that Arwood engaged in a practice of estimating weights,[261] but he apparently chose not to confront Arwood with questions about the legitimacy of these charges and the reliability of the revenue they generated. On this point, the Court's exchange with Mahon at trial was disquieting:

> Mahon: We didn't get into the nuances of the actual billing of the customer since I wanted to more understand the process flow of the customer. And coming in, they would receive an invoice to the end."
>
> Court: But I assume you appreciated that billing the customer and the customer paying was how the company succeeded. That was sort of integral to the success of the business you were buying. Right?

---

[259] Tr. 470:19–471:2 (Mahon) ("THE COURT: Did you ask to get access to any customers during that process? THE WITNESS: At the time, Your Honor, the customer concentration was so low that the single largest customer was the Florida prison system, which we asked to see those contracts. But any individual customer was less than 1 percent, I believe, of the overall revenue.").

[260] Tr. 197:3–198:4, 307:8–13 (Mahon); JX 160 at 36 (recognizing "overage[s]" as additional charges customers may pay).

[261] Tr. 940:21–942:18 (Arwood) (testifying he told Mahon about how they billed overages).

67

> Mahon: Yes, Your Honor, but we reviewed customer reviews. They had a 4-Star rating in Trustpilot, and so we felt that they were doing a good job at the time.[262]

Mahon's answer was unresponsive. He was tasked with creating what did not exist, and he had access to anything he asked for to enable him to complete that task. To now claim that he was somehow misled by a picture that he himself was painting is not justifiable.[263]

Taken together, these facts prove that AWS was not justified in relying upon any supposed extra-contractual impressions created by Arwood pre-closing regarding the fitness of the brokerage business, or any representations expressly made by the Selling Entities in the APA, especially given Mahon and Broadtree's

---

[262] Tr. 466:9–21 (Mahon). AWS argues that even the customer reviews were misleading because Arwood offered gift cards to employees to write positive reviews. *See* DOB at 14–15. That contention is supported by credible evidence. Robinson testified that employees received bonuses for "procuring Trustpilot reviews," and Henley testified that Arwood had employees "make reviews online under different names." Tr. 493:5–7 (Henley); Tr. 614:11–13 (Robinson). Even so, for a sophisticated private equity buyer, it is not credible to suggest that positive online customer reviews were sufficient to fill in gaps left by non-existent or incomplete financial records, or that they somehow diverted this sophisticated buyer from the path of further inquiry.

[263] For the first time at oral argument, AWS argued that "Arwood selectively provided some real dump tickets during due diligence," relying on JX 350. PT OA at 77:12–20. JX 350 is unhelpful. It contains not just bills from Arwood Waste to customers but also several bills from service providers to Arwood Waste, and almost none of the invoices include overage weights.

level of "knowledge and experience."[264] Having failed to prove scienter and justifiable reliance, AWS cannot succeed on its fraud and fraudulent inducement claims.

## B. Breach of Representations

AWS has also asserted breaches of representations and warranties within the APA against all Counterclaim Defendants and Goode. To prevail on a breach of contract claim, a party must prove the existence of a contractual obligation, the breach of that obligation, and resulting damages.[265] Importantly, unlike its fraud claims, where justifiable reliance is a *prima facia* element, in the context of its breach of contract claim, "[t]o the extent [the Selling Entities] warranted a fact or circumstance to be true in the [APA], [AWS was] entitled to rely upon the accuracy of the representation []regardless of what [its] due diligence may have or should have revealed."[266]

AWS points to four different provisions of the APA that were breached—Section 3.7 (Financial Statements), Section 3.9 (Accounts Receivable, Accounts

---

[264] 37 C.J.S. *Fraud* § 51 (Feb. 2022 Update).

[265] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *WaveDivision Hldgs. v. Millennium Digit. Media Sys.*, *L.L.C.*, 2010 WL 3706624, at *13 (Del. Ch. Sept. 17, 2010).

[266] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. Ct. 2005), *aff'd*, 886 A.2d 1278 (Del. 2005).

Payable), Section 3.20 (Compliance with Laws), and Section 3.22 (Employees). I address each in turn below. But first, I address whether "sandbagging" is implicated by the facts proven here, as Arwood argues, and, if so, how the doctrine affects the viability of AWS's breach of contract claims.[267]

### 1. Sandbagging

After post-trial oral argument, I suspected that the preponderance of the evidence might prove that Mahon and Broadtree either knew pre-closing that certain representations in the APA were false or that they should have known of their falsity. Concerned that either scenario might implicate "sandbagging," I asked the parties for supplemental submissions to answer two questions:

1) What is the current state of "sandbagging" as a defense under Delaware law, particularly in light of our Supreme Court's opinion in *Eagle Force Holdings, LLC v. Campbell*?

2) Is "sandbagging" implicated if the buyer should have known that a representation or warranty was false, but did not actually know of its falsity?[268]

Having reviewed the parties' supplemental submissions, in answer to the first question, for the reasons explained below, I am satisfied that Delaware law allows a

---

[267] As discussed in more detail below, "sandbagging" colloquially "refer[s] to the practice of asserting a claim based on a representation despite having had reason to suspect it was inaccurate." *Akorn, Inc. v. Fresenius Kabi* AG, 2018 WL 4719347, at *77 n.756 (Del. Ch. Oct. 1, 2018), *aff'd*, 198 A.3d 724 (Del. 2018) (TABLE).

[268] D.I. 215.

buyer to "sandbag" a seller.  But even if it did not, in answer to the second question,

I am satisfied that "sandbagging" only applies when a buyer *knows* a representation

is false pre-closing but seeks post-closing indemnification on the representation

anyway.  As Mahon and Broadtree were recklessly indifferent to the truthfulness of

the representations, but did not actually know of their falsity pre-closing,

sandbagging is not implicated in this case in any event.

### a.  Delaware is a "Pro-Sandbagging" Jurisdiction

The term "sandbagging," in all of its uses, carries a "negative connotation."[269]

It "evokes an inference of wrongful intent and malfeasance" since it is generally

understood "to mean to misrepresent or conceal one's true intent, position, or

potential in order to take advantage of an opponent."[270]  Of course, the term's origins

likely explain the modern perception of a "sandbagger":

> In the 19th century, ruffians roamed the streets armed with cotton socks.
> These ostensibly harmless socks were filled with sand and used as
> weapons to rob innocent, unsuspecting victims.  Sandbaggers, as they
> came to be known, were reviled for their deceitful treachery:
> representing themselves as harmless, until they have you where they

---

[269] Stacey A. Shadden, *How to Sandbag Your Opponent In the Unsuspecting World of High Stakes Acquisitions*, 47 Creighton L. Rev. 459, 459 (2014) ("Shadden").

[270] *Id.; see also* Griffith Kimball, *Sandbagging: Eagle Force Holdings & the Market's Reaction*, 46 B.Y.U. L. Rev. 571, 571 (2020) (Comment) ("Kimball") ("The word carries a negative connotation; Merriam-Webster defines it as meaning 'to treat unfairly or harshly' or 'to conceal or misrepresent one's true position, potential, or intent especially in order to gain an advantage.'") (citation omitted).

want you.  Then, revealing their true intentions, they spring their trap on the unwitting.[271]

As noted, in the context of a business acquisition, a "sandbagging" buyer refers to a buyer who "is or becomes aware that a specific representation and warranty made by the seller is false, yet instead of alerting the seller to this fact, the buyer consummates the transaction, despite its knowledge of the breach, and seeks post-closing damages against the seller for the breach."[272]  The practice of sandbagging in acquisitions is ubiquitous; so much so that transactional planners have developed a sandbagging playbook that calls for different approaches to the issue depending on which side of the deal one sits and whether the state law

---

[271] Daniel L. Chase, *M&A After Eagle Force: An Economic Analysis of Sandbagging Default Rules*, 108 Calif. L. Rev. 1665, 1666 (2020) (Note) ("Chase"); *see also Akorn*, 2018 WL 4719347, at *77 n.756 ("[Sandbagging] is a loaded and pejorative term: It 'originates from the 19th century where gang members would fill socks full of sand to use as weapons against unsuspecting opponents.'") (citing Shadden, at 459).

[272] Shadden, at 459; *see also* Charles K. Whitehead, *Sandbagging: Default Rules and Acquisition Agreements*, 36 Del. J. Corp. L. 1081, 1081 (2011) ("Whitehead") ("In the M&A World, a buyer 'sandbags' a seller when, knowing the seller has materially breached a warranty, it closes the deal and then asserts a post-closing claim."); Seth Cleary, *Delaware Law, Friend or Foe? The Debate Surrounding Sandbagging and How Delaware's Highest Court Should Rule on a Default Rule*, 72 S.M.U. L. Rev. 821, 825 (2019) (Comment) ("Cleary") ("In the United States M&A context, sandbagging is often used to describe a situation where a buyer knows that a seller's representations or warranties are in breach prior to closing, but in spite of this breach, the buyer closes the transaction and then pursues indemnification.").

governing the deal has emerged as "pro-sandbagging" or "anti-sandbagging."[273] While there certainly is nuance in how a planner might approach sandbagging, the playbook boils down to three approaches: (1) including a clause within the acquisition agreement that "expressly permit[s] buyer to engage in sandbagging even if buyer has previous knowledge of the falsity of seller's representations and warranties"; (2) including a clause within the acquisition agreement that "expressly prevent[s] buyer [from pursuing] indemnification for a breach of seller's representations or warranties if buyer had prior knowledge of its inaccuracy"; or (3) "remaining silent on the issue."[274]

The parties to the APA appear to have taken the first approach. While neither party addressed this in their supplemental submissions, the APA does address sandbagging and expressly allows for it. In the section entitled (appropriately) "Risk Allocation," the APA provides that an Indemnified Party "shall be entitled to indemnification . . . notwithstanding whether an employee, representative or agent of the Indemnified Party [in this case AWS] seeking to enforce a remedy knew or had reason to know of such breach and regardless of any investigation by such

---

[273] *See, e.g.*, Whitehead, at 1092–93 (surveying jurisdictions and acquisition agreements; concluding that New York and Delaware are pro-sandbagging and that very few acquisition agreements contain anti-sandbagging clauses).

[274] Shadden, at 461 (citing Broc Romanek et al., *Negotiating Public-Private Mergers*, 6 M&A Law 1 (2002)).

Indemnified Party."[275]  Given that the APA is otherwise silent with respect to the issue, even if Section 7.1(b) were to be construed as somehow not expressly endorsing sandbagging, the parties then would be deemed to have invoked the default common law of Delaware.[276]  That common law, as explained below, leads to the same result.[277]

Delaware is "more contractarian" than most states,[278] and our law respects contracting parties' "right to enter into good and bad contracts."[279]  Our courts "enforce[] both."[280]  Given these strong contractarian propensities, it is surprising that our highest court has not yet had occasion to resolve the "interesting question" of "whether a party can recover on a breach of warranty claim where the parties

---

[275] APA § 7.1(b).

[276] *See Level 4 Yoga, LLC v. CorePower Yoga, LLC*, 2022 WL 601862, at *14 n.150 (Del. Ch. March 1, 2022) (holding that parties to a contract always negotiate "in the shadow" of the common law of contracts, unless they expressly disclaim that law).

[277] I address the Delaware common law as relates to sandbagging both in the event one might disagree with my construction of Section 7.1(b) and also because the parties have not addressed the effect of Section 7.1(b) in their briefing or arguments to the Court.

[278] *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *12 (Del. Ch. July 11, 2011) (Strine, C.).

[279] *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

[280] *Id.*

know that, at signing, certain of them were not true."[281] In the absence of definitive guidance from the Supreme Court, I do my best to discern what the law of Delaware on sandbagging is, or at least, what I believe it should be.

In my view, "Delaware is what is affectionately known as a 'sandbagging' state."[282] In his recent decision in *Akorn*, Vice Chancellor Laster well explained the reason why this is (or should be) so:

> From my perspective, the real question is whether the risk allocation in the contract controls, or whether a more amorphous and tort-like concept of assumption of risk applies. To my mind, the latter risks having cases routinely devolve into fact disputes over what was provided or could have been provided in due diligence. The former seems more in keeping with Delaware's contractarian regime, particularly in light of Delaware's willingness to allow parties to restrict themselves to the representations and warranties made in a written agreement.[283]

This perspective is entirely consistent with, and driven by, the settled Delaware

---

[281] *Eagle Force Hldgs., LLC v. Campbell*, 187 A.3d 1209, 1236 n.185 (Del. 2018); *see also* Chase, at 1671 ("Delaware's sandbagging default rule is ambiguous."); Kimball, at 582 ("As of this writing, the Delaware Supreme Court has still not definitively ruled on sandbagging.").

[282] *NASDI Hldgs. v. N. Am. Leasing*, No. 10540-VCL, at 57 (Del. Ch. Oct. 23, 2015) (TRANSCRIPT); *see also Cobalt Operating, LLC v. James Crystal Enters., LLC*, 2007 WL 2142926, at *28 (Del. Ch. July 20, 2007) ("[A] breach of contract claim is not dependent on a showing of justifiable reliance. . . . Having contractually promised [the buyer] that it could rely on certain representations, [the seller] is in no position to contend that [the buyer] was unreasonable in relying on [the seller's] own binding words."), *aff'd*, 945 A.2d 594 (Del. 2008).

[283] *Akorn*, 2018 WL 4719347, at *77 n.756.

law that "reliance is not an element of a claim . . . for breach of any of the representations or warranties in the agreement."[284]  Here again, the reasoning of our law is sound:

> Due diligence is expensive and parties to contracts in the mergers and acquisitions arena often negotiate for contractual representations that minimize a buyer's need to verify every minute aspect of a seller's business.  In other words, representations like the ones made in [the agreement] serve an important risk allocation function.  By obtaining the representations it did, [the buyer] placed the risk that [the seller's] financial statements were false and that [the seller] was operating in an illegal manner on [the seller].  Its need then, as a practical business matter, to independently verify those things was lessened because it had the assurance of legal recourse against [the seller] in the event the representations turned out to be false. . . . [H]aving given the representations it gave, [the seller] cannot now be heard to claim that it need not be held to them because [the buyer's] due diligence did not uncover their falsity. . . .  Having contractually promised [the buyer] that it could rely on certain representations, [the seller] is in no position to contend that [the buyer] was unreasonable in relying on [the seller's] own binding words.[285]

Pro-sandbagging is often characterized as the "modern rule."[286]  Some who

---

[284] *Id.* (cleaned up) (citing *Gloucester Hldg. Corp. v. U.S. Tape & Sticky Prods., LLC*, 832 A.2d 116, 127–28 (Del. Ch. 2003)); *Interim Healthcare*, 884 A.2d at 548.

[285] *Akorn*, 2018 WL 4719347, at *77–78 (quoting *Cobalt Operating*, 2007 WL 2142926, at *28).

[286] Bryan Westhoff, *You Were Relying on What? The Effect of a Pro-Sandbagging Clause on a Fraud Claim*, 2018 Bus. L. Today 1, 4 (2018); *see also* Victor P. Goldberg, *Protecting Reliance*, 114 Colum. L. Rev. 1033, 1080 (2014) ("The weight of authority, and practice, is with the pro-sandbagging side."); Chase, at 1665 ("Dealmakers have long considered Delaware as a 'pro-sandbagging' state following the modern trend."); Kimball, at 574 ("Sandbagging law has evolved from tort to contract law, and 'modern theory' courts like

disagree with the "modern rule" view sandbagging as bad economics in that it creates

penalty-like incentives in the bargaining process.[287]  Others view sandbagging as

simply unfair or "ethically questionable."[288]   While I acknowledge there is

something unsettling about allowing a buyer to lay in wait on the other side of

closing with a breach claim he knew before closing he would bring against the seller,

the risk of such litigation, like any other risk, can be managed expressly in the

bargain the parties strike.   A pro-sandbagging rule supports the notion that

"representations and warranties serve an important risk allocation function."[289]

Indeed, as a general matter, Delaware's "public policy favor[s] private ordering"[290]

---

Delaware and New York generally consider the representations and warranties as bargained-for provisions and refuse to change the parties' deliberate allocation of risk.").

[287] *See, e.g.*, Whitehead, at 1105–07. *But see generally* Chase (critiquing this conclusion).

[288] *See, e.g.*, Shadden, at 474 ("Many scholars have recently asked the question whether sandbagging is ethical. . . .   Under both European and Canadian law, the default rule is consistently in favor of anti-sandbagging.  An anti-sandbagging provision appeals to one's sense of fairness . . . .").

[289] *Pilot Air Freight, LLC v. Manna Freight Sys., Inc.*, 2020 WL 5588671, at *2 (Del. Ch. Sept. 18, 2020) (citing *In re Tibco Software Inc. S'holders Litig.*, 2014 WL 6674444, at *18 (Del. Ch. Nov. 25, 2014)); *Cobalt Operating*, 2007 WL 2142926, at *28; *see also* Whitehead, at 1084 (observing that under the modern rule, a "[b]uyer can argue it bargained for the warranties as a means to allocate risk and minimize cost"); *cf.* Chase, at 1681 ("By adopting a pro-sandbagging default rule, Delaware and other courts . . . will more efficiently allocate risk, decreasing transaction costs and reducing sandbagging litigation . . . .").

[290] *Manti Hldgs., LLC v. Authentix Acq. Co., Inc.*, 261 A.3d 1199, 1217 (Del. 2021).

and "respects the freedom of parties in commerce to strike bargains and honors and enforces those bargains."[291]  I see no reason to alter that public policy here, especially since "anti-sandbagging clauses" have emerged as effective risk management tools that every transactional planner now has in her toolbox.[292]

When parties choose not to (or fail to) allocate the risk of sandbagging in their contract, the buyer may rest on its reasonable belief that it has acquired as part of the transaction the seller's implicit promise to be truthful in its representations.[293]  "This view of 'reliance'—i.e., as requiring no more than reliance on the express warranty as being a part of the bargain between the parties—reflects the prevailing perception of an action for breach of express warranty as one that is no longer grounded in tort,

---

[291] *Related Westpac LLC v. JER Snowmass LLC*, 2010 WL 2929708, at *6 (Del. Ch. July 23, 2010).

[292] *See, e.g.*, Kimball, at 576 (noting that attorneys can bypass default pro-sandbagging rules by "simply negotiat[ing] for an anti-sandbagging provision"); Jacek Jastrzębski, *"Sandbagging" and the Distinction Between Warranty Clauses and Contractual Indemnities*, 19 U.C. Davis Bus. L. J. 207, 209 (2019) ("Jastrzębski") (acknowledging, in discussing default sandbagging rules, that "parties can contract for a pro-sandbagging or anti-sandbagging solution in their agreement").

[293] *See CBS Inc. v. Ziff-Davis Publ'g Co.*, 553 N.E.2d 987, 1000–01 (N.Y. 1990) ("The critical question is not whether the buyer believed in the truth of the warranted information, as Ziff–Davis would have it, but whether it believed it was purchasing the seller's promise as to its truth.") (citation and internal quotations omitted).  To reiterate, in this case, the APA expressly allows for sandbagging.  *See* APA § 7.1(b).

but essentially in contract."[294]  Viewed through the lens of contract, not tort, the question is simple: was the warranty in question breached?  If it was, then the buyer may recover—regardless of whether she relied on the warranty or believed it to be true when made.[295]  "Stated otherwise, the fact that the buyer has questioned the seller's ability to perform as promised should not relieve the seller of his obligations under the express warranties when he thereafter undertakes to render the promised performance."[296]  Reliance, whether justified or unjustified, is not a *prima facie* element of breach of contract.[297]

As applied here, Arwood and the Selling Entities made certain representations and warranties in the APA.  AWS accepted those promises when it signed the contract.  Whether AWS was oblivious to their falsity pre-closing, or fully cognizant, does not matter.  As the APA itself acknowledges, AWS was entitled to believe that it was "purchasing [the Selling Entities'] promise" that the representations and

---

[294] *Id.*; *see also* Jastrzębski, at 215 ("Typically, the states that follow the anti-sandbagging rule are more strongly rooted in the tortious nature of warranty liability, while those that adopt the pro-sandbagging rule have moved to the modern, contractual approach to warranty liability.").

[295] *Ziff-Davis*, 553 N.E.2d at 1001.

[296] *Id.*

[297] *Interim Healthcare*, 884 A.2d at 548.

warranties were true, and it may recover damages if that promise was breached.[298]

### b. Sandbagging Is Not Implicated Here

In the Court's second question to counsel, the Court inquired whether sandbagging is even implicated when the buyer does not have actual knowledge pre-closing that the seller's representations were false. Having considered the issue, guided by the parties' supplemental submissions, I am satisfied the answer is no—sandbagging is not implicated unless the buyer actually knew pre-closing that the seller's representations were false. Thus, even if Delaware were an "anti-sandbagging" jurisdiction, sandbagging is not implicated here because the evidence does not prove that AWS knew the APA's representations and warranties were false before it closed.

In its supplemental submission, AWS argues that "the applicable inquiry is what the buyer *knew* at the time of signing, not what the buyers *should have known*."[299] Most commentators appear to share this view.[300] Importantly, this is

---

[298] *See Ziff-Davis*, 553 N.E.2d at 1001; *see also* APA § 7.1(b).

[299] Suppl. Ltr. Submission from E. Chaney Hall to V.C. Slights Regarding Sandbagging (D.I. 216) at 10. For their part, Arwood and Goode assert that "Delaware law has not resolved this issue." Ltr. from Counsel for Pls. to the Ct. Regarding Suppl. Post-Trial Briefing (D.I. 217) at 5.

[300] *See, e.g.*, Whitehead, at 1081 ("In the M&A World, a buyer 'sandbags' a seller when, *knowing* the seller has materially breached a warranty, it closes the deal and then asserts a post-closing claim.") (emphasis added); Jastrzębski, at 208 ("[A] warrantee 'sandbags' the

also consistent with how our Supreme Court, in passing, recently framed the unresolved issue of sandbagging in *Eagle Force*. Both the majority opinion and then-Chief Justice Strine's dissent strongly suggested that the buyer's actual knowledge of falsity animates the sandbagging inquiry, not constructive knowledge.[301]

For these reasons, I am satisfied that sandbagging is not implicated if a buyer, exercising reasonable care, should have known a representation was false but did not actually know. But that does not end the inquiry. The Court's question to counsel

---

warrantor if he enters into an agreement *knowing* that a warranty clause is incorrect and subsequently brings a claim against the warrantor . . . .") (emphasis added); Kimball, at 571 ("In corporate transactions, 'sandbagging' refers to a situation where a buyer *knows* that a seller's representation in a purchase agreement is false, but nevertheless closes the transaction and later seeks to hold the seller liable for that breach.") (emphasis added); Cleary, at 825 ("In the United States M&A context, sandbagging is often used to describe a situation where a buyer *knows* that a seller's representations or warranties are in breach prior to closing, but in spite of this breach, the buyer closes the transaction and then pursues indemnification.") (emphasis added); Chase, at 1665 ("In the Mergers & Acquisition (M&A) context, a buyer 'sandbags' a seller when the buyer, despite *knowing* pre-closing that the seller materially breached a representation or warranty, closes the deal anyway and subsequently seeks indemnification from the seller for damages arising out of a breach.") (emphasis added). *But see id.* at 1667 ("'Anti-sandbagging' states do not allow a buyer to sue a seller for breach of warranty if the buyer knew (*or should have known*) of the breach prior to closing without an express contractual provision to the contrary.") (emphasis added).

[301] *Eagle* Force, 187 A.3d at 1236 n.185 ("We acknowledge the debate over whether a party can recover on a breach of warranty claim where the parties *know* that, at signing, certain of them were not true.") (emphasis added); *id.* at 1247 (expressing "doubt" that a buyer can "turn around and sue because of what he *knew to be false* remained so") (Strine, C.J., concurring in part and dissenting in part) (emphasis added).

assumed the evidence would reveal that the buyer's state of mind was "did not know, but should have known" with respect to the falsity of the operative representations. But the preponderance of the evidence has actually revealed that AWS's lack of knowledge was the product of reckless indifference. That, then, raises the additional question of whether reckless indifference will implicate sandbagging. Because I am satisfied the parties' supplemental submissions are sufficiently responsive to the question, I see no need to ask them to do more.

In my view, AWS's argument that actual knowledge is required to implicate sandbagging applies in full force to whether reckless indifference suffices. Just as recklessness is beyond simple negligence, recklessness is not actual knowledge.[302] And actual knowledge appears to be what is required to trigger the sandbagging inquiry, as the language from *Eagle Force* and commentators cited above suggests.[303]

---

[302] *Compare Knowledge*, Black's Law Dictionary (11th ed. 2019) ("An awareness or understanding of a fact or circumstance; a state of mind in which a person has no substantial doubt about the existence of a fact."), *with Recklessness*, Black's Law Dictionary (11th ed. 2019) ("Reckless involves a greater degree of fault than negligence *but a lesser degree of fault than intentional wrongdoing*.") (emphasis added).

[303] I note that the term's origin is consistent with this conclusion. Sandbagging robbers knew their sock weapons were filled with sand; they did not swing socks at unsuspecting victims with reckless disregard for their weapons' efficacy.

Based on the foregoing, I am satisfied that "sandbagging" is implicated only when a buyer has actual knowledge that a representation is false. Therefore, with no concern that a sandbagging defense could defeat AWS's claim for breach of the APA's representations and warranties, I turn now to the specific representations at issue.

### 2. AWS Has Proven Breaches of Representations and Warranties

As noted above, AWS alleged that Arwood and the Selling Entities breached Section 3.7 (Financial Statements), Section 3.9 (Accounts Receivable, Accounts Payable), Section 3.20 (Compliance with Laws), and Section 3.22 (Employees). I address each in turn.

#### a. Section 3.7: Financial Statements

First, AWS alleges a breach of Section 3.7 of the APA. At Section 3.7, the Selling Entities represented that:

> Each Company has delivered to Buyer and set forth on Schedule 3.7 [the financial statements listed]. Each of the foregoing financial statements is consistent with the books and records of each Company. The records provided by the Companies to the Buyer underlying the Financial Statements are complete and accurate in all respects, and the Financial Statements present fairly in all material respects the financial condition and results of operations and cash flows of each Company . . . .[304]

---

[304] APA § 3.7.

AWS argues that Arwood Waste's Financial Statements (as defined) did not accurately represent its financial condition or cash flows because both were based, in large measure, on revenue generated by overbilling.[305] In this regard, AWS points to Arwood Waste's false overage charges, improper lien fees, fabricated demurrage fees, failure to pay haulers, and its purported failure to pay employees.[306] The result of these practices, AWS contends, was an inflated purchase price caused by an inflated EBITDA.[307] At first glance, the contention appears to be well supported by the evidence.

But the analysis is not so simple. As a preliminary matter, the "Financial Statements" that AWS argues were inaccurate are those "set forth on Schedule 3.7."[308] The problem is no Financial Statements were actually "set forth on Schedule 3.7."[309] Not one.

---

[305] DOB at 39.

[306] *Id.*

[307] *Id.*

[308] APA § 3.7.

[309] *See* JX 187 at 3.

Even assuming the applicable financial statements were "delivered,"[310] the Financial Statements were prepared by Mahon. All parties knew that Arwood Waste had no financial statements or "formal records of any sort."[311] It would be extremely odd that Arwood and the Selling Entities would "rep against" financial statements that Mahon created for the buyer, and the incongruity was not lost on Broadtree; Mahon sent an email to Elliott Davis coyly stating that "John [Arwood] will rep against this income statement as the ONLY income statement that exists for 2017 and 2018 so it is the authority :)."[312] Although the typical dynamic is that the buyer relies on the seller for the accuracy of the financial statements, this case strangely presents the opposite dynamic.[313] It seems ridiculous on its face that Mahon, knowing full well that Arwood Waste did not have reliable financial records, would undertake to create the Financial Statements, tell Arwood to make representations

---

[310] *See* JX 102 (email from Mahon stating that "[Arwood] will rep against this income statement").

[311] Tr. 193:1–10 (Mahon); Tr. 719:4–8 (Arwood) (explaining he did not "do financials or any of that type of stuff" and "just knew what [he] was basically revenuing [sic]"); PTO ¶ 65.

[312] JX 102.

[313] *See* Arwood Dep. Vol. II 188:6–20 ("Q. What about these statements of profit and loss and cash flows, do you agree that you are telling—that you are representing that all those things are true and accurate? A. . . . I do because I was trusting Sean [Mahon]. I don't know nothing about profit and loss and cash flows.").

as to the accuracy of those records, not attach them to the agreement as expressly required, and then sue Arwood for breach.

And yet, unlike other representations in the APA,[314] Section 3.7 contained no knowledge qualifier, meaning that Arwood and the Selling Entities did not represent that the financials were accurate *to their knowledge*. They represented that they were "complete and accurate in all respects."[315] Because Arwood used false "estimated" overages and utilized improper lien practices when billing customers, it is highly unlikely that the Financial Statements were "complete and accurate in all respects." And, contrary to reality, the clear and unambiguous terms of the APA provide that the obligation to provide accurate Financial Statements rested with Arwood and the Selling Entities, not AWS.[316]

The proof of breach with respect to Section 3.7, in the end, stands in equipoise. On the one hand, the provision unequivocally places responsibility on the sellers to provide accurate Financial Statements, and they likely did not do so. On the other hand, AWS failed to ensure that the Financial Statements were attached to the contract it drafted, which makes assessing their accuracy (either by sellers or the

---

[314] *See, e.g.*, APA §§ 3.10, 3.17, 3.18, 3.19, 3.20.

[315] APA § 3.7.

[316] *See id.* ("*Each Company has delivered to Buyer and set forth on Schedule 3.7: . . .* The records provided by the Companies to the Buyer . . . .") (emphasis added).

Court) impossible. Ultimately, however, whether Section 3.7 was breached does not matter; as discussed below, Section 3.20 was breached, and AWS is entitled to damages for that breach.

### b. Section 3.9: Accounts Receivable

In its post-trial briefs, AWS alleges Arwood and the Selling Entities breached Section 3.9, which represents that "[a]ll of the accounts received of [sic] each Company that are less than 120 days outstanding are valid and enforceable claims."[317] AWS alleges that this representation was false because "Arwood Waste charged customers improper extra fees and placed unwarranted liens on customer property."[318]

But AWS did not plead a breach of Section 3.9 in its counterclaim.[319] That alone is fatal to the claim. Moreover, AWS's argument assumes that because a portion of the underlying charges to customers was the product of fraud, some

---

[317] APA § 3.9; *see* DOB at 40; Def./Countercl. Pl. AW Site Servs., LLC's Answering Post-Trial Br. ("DAB") (D.I. 208) at 38.

[318] DOB at 40.

[319] *See* Countercls. ¶¶ 78, 94 (referring only to Sections 3.7, 3.20, and 3.22 of the APA). It appears the first mention of Section 3.9 appears on page 46 of AWS's pre-trial brief (D.I. 162). *See Snow Phipps Gp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *44 ("Generally speaking, '[w]hen an argument is first raised in a pretrial brief after the parties already have shaped their trial plans, it is simply too late and deemed waived.'") (citing *ABC Woodlands L.L.C. v. Schreppler*, 2012 WL 3711085, at *3 (Del. Ch. Aug. 15, 2012)).

unidentified portion of the amounts owed but not paid by customers must also be the product of fraud. Yet, it made no effort to parse this out in the evidence. It simply assumes, without proof, that all receivables are laced with fraudulent charges. Accordingly, AWS has not proven a recoverable breach of Section 3.9.

### c. Section 3.20: Compliance with Laws

AWS alleges that Arwood and the Seller Entities breached Section 3.20, which states that "[e]ach Seller Entity has materially complied with and is currently in compliance with all Laws of federal, state, local and foreign governments."[320] In particular, AWS points to several of the business practices already discussed and argues that these practices resulted in violations of Law (as defined).[321] I agree.

*First*, Arwood and the entities he controlled did not comply with the law in their billing practices regarding weight overages. They systematically, inaccurately, and intentionally overcharged their customers.[322] AWS's expert testimony supports

---

[320] APA § 3.20. The term "Laws" is broadly defined in the APA to include the common law of fraud. APA § 1.1.

[321] As explained below, AWS's claims regarding Arwood's conduct with respect to his parents as employees must be rejected, so I do not accept or address AWS's argument that "Arwood failed to comply with applicable wage and hours laws" concerning his parents. DOB at 41.

[322] *See Cobalt Operating*, 2007 WL 2142926, at *27 ("Engaging in a repeated pattern of fraud is clear non-compliance with applicable law . . . ."). To state the obvious, a claim that Arwood committed fraud against his customers would not suffer from the same defects as the claim that he defrauded AWS. For example, the customers justifiably relied on the

this point. Robert Wallace, AWS's industry expert, credibly opined that Arwood's practice of estimating weights was "the opposite of industry norms" and "grossly violate[d] industry practices."[323] And Wyner testified persuasively that "it is scientific malpractice to include extra-significant digits" when estimating, such as Arwood's frequent use of weights that end in .88, because it gives customers the impression that actual weights were used to calculate their charges.[324] In this regard, Arwood's testimony that he systematically used .88 in his weight estimates because it was "easy to remember" was not credible.[325]

*Second*, as noted, the preponderance of the evidence indicates that Arwood placed false liens on customer projects, meaning liens that were not justified by

weights upon which Arwood Waste calculated their bills because they fully relied upon Arwood Waste to tell them the weight charged and the amount due. And even if Arwood did not *fully* appreciate the wrongfulness of the practice, he likely had the scienter necessary for fraud—that is, he knew the weights were estimates, knew they were not accurate and knew the customer would be misled to believe some level of precision had been used in the calculation given that the weights routinely suggested exactness to a hundredth of a decimal point. *See* Tr. 1185:4–5, 1186:15–17 (Wyner). That Arwood likely defrauded customers does not mean he also defrauded AWS, particularly given Arwood's reasonable belief that Mahon had fully explored all aspects of Arwood Waste's operations.

[323] JX 283 at 8.

[324] Tr. 1185:4–5, 1186:15–17 (Wyner).

[325] Tr. 776:15–777:17 (Arwood).

applicable law.[326]  These unlawful liens damaged AWS because the revenue derived

from illegal lien fees could not be replicated post-closing.[327]

---

[326] *See, e.g.*, Tr. 180:24–181:2 (Mahon); Tr. 493:18–494:12 (Henley); 181:1–10 (Mahon); JX 10; JX 27; JX 40; JX 51; JX 72; JX 74; JX 108; JX 127; JX 128; DOB at 28, 41 (citing 56 C.J.S. *Mechanics' Liens* § 470) ("In a proceeding for the enforcement of a mechanic's lien, the evidence must be sufficient to show a furnishing or use of the labor or material for or in a building or improvement as required by statute.").

[327] AWS also argues that Arwood Waste did not materially comply with the law when it failed to pay haulers for work they performed when customers did not pay him. *See, e.g.*, JX 33; JX 38; JX 247; Tr. 496:15–510:8 (Henley); Tr. 456:17–460:9 (Mahon).  In fact, Mahon testified that "it was a *common practice* if [Arwood] had not received payment to not pay the haulers." Tr. 459:12–13 (Mahon).  In response, Arwood argues that AWS fails to cite any legal authority that supports the proposition that Arwood failed to comply with the law when he failed to pay haulers.  *See* PAB at 37–38.  While Arwood Waste's consistent failure to pay contractually owed fees to haulers might well have been a violation of its legal obligations to those vendors, that would be a matter of contract, and I have insufficient evidence of the contractual relationships between Arwood Waste and its various haulers to render that judgment.

### d.  Section 3.22: Employees

Next, AWS alleges that Arwood and the Selling Entities breached Section 3.22 of the APA.  Specifically, AWS claims the sellers misrepresented Schedule 3.22(a)(i), which sets out a "complete and accurate list of all employees of each Company."[328]  AWS claims that Arwood's mother and father should have been disclosed as employees, but instead Arwood "did not disclose, and even tried to hide, the involvement of [his] parents."[329]  As explained below, there was no breach of Section 3.22.

Arwood's mother, Pansy Arwood, paid invoices for the brokerage business on a part-time basis for $100 a week.[330] According to AWS, "[Mrs. Arwood's] salary did not match the amount of work she actually performed."[331]  As a result, Mahon

---

[328] Countercls. ¶ 41(c) (citing APA § 3.22).

[329] DAB at 40.

[330] Tr. 743:24–744:8 (Arwood).

[331] DOB at 42; Tr. 202:6–17 (Mahon) (explaining that his impression was that Pansy Arwood was not an employee of Arwood Waste); Tr. 460:11–461:4 (Mahon) ("A. My understanding pre-acquisition was she did nothing for Arwood Waste.  Post-acquisition, I learned that she was in charge of paying the haulers.  Q. How much did she make per year from Arwood Waste?  A. $500 a year, I believe.  Q. How much work would that suggest to you?  A. That she was not working.  Q.  So would you have expected to have to hire a full-time employee to do that work?  A. If she was, in fact, doing it full time, then I would have to hire a full-time employee to do that work.  At the time it was not my expectation.").

did not "expect to have to hire an entire accounts payable department, particularly for paying invoices," to replace Mrs. Arwood post-acquisition.[332]

But AWS admits that Mrs. Arwood was disclosed as an employee.[333] Schedule 3.22(a)(i) lists and categorizes the Selling Entities' employees.[334] The second employee on the list, directly below John Arwood, is Pansy Arwood.[335] Moreover, the trial record makes clear that Mahon and Broadtree had plans after the acquisition to hire internal staff, especially in accounting and for other essential services.[336] Finally, Mahon was on site at Arwood Waste over a period of several months, and the suggestion that Mahon did not understand what Mrs. Arwood did for the businesses is simply not credible. From this and other evidence, I am satisfied

---

[332] Tr. 202:13–203:19 (Mahon).

[333] DOB at 42.

[334] JX 303.

[335] *Id.*

[336] JX 293 (Margolin Report) at 45 ("It is common to see family on the payroll of privately held businesses, often for relatively insignificant amounts, for questionable services rendered. Generally accepted valuation practices typically omit such expenses from their financial analyses as inconsistent with fair market value. Further, to the extent Mr. Arwood's parents provided any economic benefit to the Acquired Business, one would classify it as an accounting function. Broadtree's Investor Deck opined that the Acquired Business 'operates with a very lean organization, too lean, as there is no accounting function or sales team and key functions are currently outsourced,' and 'today'—as operated by Mr. Arwood, an 'Accounting' department is 'Not Present,' and that post-acquisition the Acquired Business will outsource the function until it hires an internal staff.") (quoting from JX 160 at 34, 38–39).

that it was disclosed to AWS that Mrs. Arwood was an employee, that AWS understood what she did for the businesses, and that it appreciated it would need to replace her after the acquisition closed.

Arwood's father was not listed in Schedule 3.22(a)(i). Mr. Arwood occasionally ran errands, monitored payroll, deposited checks to the bank, reviewed the credit card statements, and sometimes picked up lunch for staff.[337] Given his minimal responsibilities as essentially a company volunteer, AWS's contention that it "was forced to hire and pay new employees to replace Arwood's [father] at substantial cost" is not persuasive.[338]

* * * * *

For reasons explained above, AWS has proven that Arwood's brokerage business was not operated in compliance with the law in breach of Section 3.20. I address the remedy for the breach below.

## C. The Implied Covenant of Good Faith and Fair Dealing

AWS also brings a claim for breach of the implied covenant of good faith and fair dealing. "[A]n implied covenant of good faith and fair dealing inheres in every

---

[337] Tr. 511:22–512:2 (Henley); Tr. 615:10–15 (Robinson); 744:11–19 (Arwood) (explaining that his father would pick up lunch, "run errands," and do "[n]ot much of nothing").

[338] DOB at 19.

contract."[339]  Its application "should be rare and fact-intensive, turning on issues of compelling fairness,"[340] and limited to "a situation [] that was unforeseen by the parties where the agreement's express terms do not cover what should happen."[341] In other words, "[t]he application of the implied covenant . . . is limited to filling contractual gaps that neither party anticipated."[342]

The implied covenant is not needed here.  Indeed, it appears AWS brought this claim as a security net—it argues that "[t]o the extent any gap-filling is needed, the implied covenant ensures that AWS's reasonable expectations will be fulfilled. It is fundamental to the purchase of a business that that business is run legitimately and lawfully."[343]  Gap-filling is not required here; the space regarding the legitimate

---

[339] *Chamison v. HealthTrust, Inc.—The Hosp. Co.*, 735 A.2d 912, 920 (Del. Ch. 1999), *aff'd*, 748 A.2d 407 (Del. 2000).

[340] *Cincinnati SMSA, Ltd. P'r v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989, 992 (Del. 1998).

[341] *Oxbow Carbon & Mins. Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 504 n.93 (Del. 2019).

[342] *E.g.*, *Ryan v. Buckeye P'rs, L.P.*, 2022 WL 389827, at *7 (Del. Ch. Feb. 9, 2022); *Nemec*, 991 A.2d at 1125 ("The implied covenant of good faith and fair dealing involves a cautious enterprise, inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated.") (internal quotation marks omitted).

[343] DOB at 45.

and lawful operations of the sellers' businesses within the APA is fully occupied by Section 3.20.

## D. Arwood Did Not Prove His Claims

The parties focused most of their efforts on the Counterclaims, and for good reason—Arwood and the Selling Entities cannot prove their claims against AWS. They allege AWS breached the APA "by asserting false and unfounded indemnification claims" and ask that the escrow agent be directed to release the escrow funds.[344] They also allege that AWS "converted the Selling [Entities]' property by wrongful acts or disposition of the accounts receivable,"[345] and tortiously interfered with Arwood Site Services' contract with a customer.[346] Finally, they allege that AWS breached Arwood's employment agreement "by failing to compensate Mr. Arwood for paid days off and for benefits, including family health insurance."[347] Each claim fails.

*First*, as explained above, AWS did not "assert[] false and unfounded indemnification claims." Arwood breached the APA and AWS followed the correct

---

[344] Compl. ¶¶ 76, 78, 82.

[345] Compl. ¶ 86.

[346] Compl. ¶ 93.

[347] Compl. ¶ 98.

procedures under the APA in asserting that breach by providing timely notice and instructing the escrow agent to retain the withheld funds.[348]

*Second*, AWS did not convert the accounts receivable. The APA transferred all accounts receivable less than 120 days outstanding to AWS.[349] After closing, the parties were to work together to determine the outstanding assets and liabilities owed to each, and the working capital adjustment would true up the differences. As Arwood testified at trial, Mahon provided him with a list of receivables.[350] He was free to collect that income. Arwood has not explained why he is owed anything else.[351] That Arwood did not collect all of the receivables owed him does not mean AWS converted those accounts.

---

[348] JX 244 (Notice of Claims); PTO ¶¶ 91–92; APA § 7.2(d).

[349] APA § 2.1(a)(viii).

[350] Tr. 924:22–925:10 (Arwood) ("Q. And Mr. Mahon gave you a list of your receivables that were more than 120 days old at the time of the acquisition; correct? A. He gave me a list that had the name and the phone number and an address, really vague. . . . So it's just a list with the amount owed, the phone number and the name and the address.").

[351] Arwood argues that JX 222 shows that Arwood and the Selling Entities are entitled to collect $70,835.19 because only $18,530.70 of the amounts depicted was collected by Arwood. But AWS has asserted that "AW[S] paid about $285,000 of Plaintiffs' bills and $31,000 of its refunds." DOB at 61. The APA contemplated that the working capital adjustment would true up any discrepancies. Arwood's bare allegation that he has not cashed in on $70,000 of the accounts receivable does not, alone, allow the Court to determine how the working capital adjustment is properly distributed. Moreover, under the APA, AWS has a contractual right to setoff. APA § 8.15. AWS's damages far outweigh this $70,000, even if Arwood had proven his entitlement to those funds, which he hasn't.

*Third*, AWS did not tortiously interfere with Arwood's contract with Adams Homes, as alleged. The Complaint alleges that Adams Homes and Arwood Site Services are parties to a valid and binding contract, as is required for a tortious interference with contract claim.[352] But Arwood testified that he was not doing business with Adams Homes at the time of the alleged interference.[353] Arwood offered no evidence to prove any of the remaining *prima facie* elements, and then ignored the claim altogether in his post-trial briefs. The claim fails.

*Finally*, AWS did not breach Arwood's employment agreement. Arwood identifies two alleged breaches—failure to provide family health insurance and failure to pay for Arwood's accrued paid time off. The health insurance claim fails because the employment agreement provided that Arwood was entitled to participate in AWS's employee benefit plans only on the same terms and conditions as other AWS executives.[354] AWS did not offer health insurance to any other executives

---

[352] *See Am. Homepatient, Inc. v. Collier*, 2006 WL 1134170, at *4 (Del. Ch. Apr. 19, 2006) ("The elements of a claim of tortious interference with contract are: (i) *the existence of a valid contract*; (ii) the interferer's knowledge of the contract; (iii) intentional interference that induces or causes a breach of the contract; and (iv) damages.") (emphasis added).

[353] 784:23–785:4 (Arwood) ("Q. Mr. Arwood, were you doing any business with Adams Homes at that point in time? A. No. Q. Were you planning on doing some business with Adams Homes? A. Yes.").

[354] JX 181 (Employment Agreement) § 2(a).

when Arwood worked for the company, so it owed no health insurance to Arwood.[355]

In any event, Arwood received additional compensation to purchase insurance.[356]

The "paid time off" claim fails because AWS actually compensated Arwood for

vacation time as promised.[357]

### E. AWS Did Not Prove Its Claims Against Third-Party Defendant Goode

As noted, AWS brings third-party claims of breach of contract and breach of

the implied covenant against Goode. Both fail. In his post-trial briefs, Goode asks

for indemnification against AWS. I deny that request.

---

[355] DOB at 62 ("Mahon testified, and Arwood did not contest, that AW[S] did not offer health insurance to any other AW[S] executives or employee during the time Arwood worked for AW[S]."); Tr. 121:3–14 (Mahon) ("Q. Were any other benefits provided throughout the time you have been operating the company? A. There's a 401(k) match as well. PTO, which is paid time off. And those are the going—Q. What about health insurance? A.—benefits. No, there is no health insurance. Q. What about on the executive level? Do executives receive any different benefits? A. No. The executives receive the same benefits.").

[356] Tr. 217:3–7 (Mahon) ("A. His salary was $200,000 plus $15,000 health insurance. Q. And did he—was he paid that $15,000 so he could buy health insurance? A. Yes, he was."); JX 304.

[357] Tr. 922:3–8 (Arwood) (testifying that he received a check for the paid time off after-the-fact and was "told by [his] attorney to return it" and did not deposit it); JX 325. Although he did not initially cash the check, Arwood deposited the check after trial. *See* Aff. of Sean Mahon in Supp. of AW Site Servs., LLC's Opening Post-Trial Br. Ex. A (D.I. 197).

**1. The APA Limited Goode's Representations to Dumpster.Me and Dumpster Wake**

The APA is crystal clear that Goode's liability is limited to Dumpster.Me and Dumpster Wake. The preamble to Section 3 of the APA acknowledges a caveat in Section 3.29,[358] which reads:

> Goode Representations. Notwithstanding anything herein [to] the contrary, the representations and warranties contained in this Section 3 by Goode with respect to any of the Companies are limited to Dumpster.Me and Dumpster Wake, and he specifically makes no representations or warranties in this Agreement as to any other Company.[359]

The APA's indemnification regime also specifies that "no claim for indemnification may be made under this Agreement against Goode except with respect to Dumpster.Me or Dumpster Wake."[360] Finally, the APA's "Knowledge" qualifier is defined as Goode's or Arwood's actual knowledge for Dumpster.Me and Dumpster Wake, but only Arwood's actual knowledge "with respect to any of the other Companies."[361]

---

[358] APA § 3.

[359] APA § 3.29.

[360] APA § 7.2(c)(iv).

[361] APA § 1.1.

99

In keeping with the APA's clear terms, to prevail on its third-party claims, AWS was obliged to prove that Goode breached a representation or warranty regarding Dumpster.Me or Dumpster Wake. It failed to do so.

*First*, Goode did not breach Section 3.7. As noted, Section 3.7 is a representation that the Financial Statements were consistent with "the books and records of each Company" and that they "present fairly in all material respects the financial condition and results of operations and cash flows of each Company."[362] In support of its claim of breach, AWS argues that Arwood's business practices rendered this representation false. But the Goode Entities' only asset was a website; they had no revenue, cash flows, business operations, financial statements or other records.[363] Goode's liability is limited to the financial statements and records of those two companies, which did not exist.

*Second*, Goode did not breach Section 3.9, a representation that "[a]ll of the accounts received of each Company that are less than 120 days outstanding are valid

---

[362] APA § 3.7.

[363] Tr. 52:11–54:9, 92:1–93:22 (Goode).

and enforceable claims."[364] Goode could not have breached this representation because Dumpster.Me and Dumpster Wake did not have accounts receivables.[365]

*Third*, Goode did not breach Section 3.20, "Compliance with Laws."[366] AWS did not prove how the Dumpster.Me website somehow operated in violation of the law, particularly given the lack of proof that the website had anything to do with billing or liening customers, nor did it make any effort to prove that customers of either of the Goode Entities were fraudulently or improperly billed.

*Finally*, Goode did not breach Section 3.22, which contains several employee-centric representations and warranties. As noted, Dumpster.Me and Dumpster Wake had no employees, independent contractors or consultants of any kind.

AWS argues that this limited view of Goode and the Goode Entities' role blinks at reality because Goode was a key player in the negotiations leading to the

---

[364] APA § 3.9.

[365] Tr. 86:5–7, 93:19–22, 94:9–11 (Goode).

[366] APA § 3.20 ("<u>Compliance with Laws</u>. Each Seller has materially complied with and is currently in compliance with all Laws of federal, state, local and foreign governments and all agencies thereof that are applicable to the Business, each Seller Entity, the business practices of the Seller Entity or any Leased Real Property, and to the Knowledge of any Seller Entity, no claims have been filed against any Seller Entity alleging a violation of any such Laws, and no Seller Entity has received notice of any such violation.").

APA.[367]  Additionally, although the website dumpster.me (held by the entity Dumpster.Me[368]) was one of the Selling Entities' 900 websites, AWS says it was only one of two that allowed customers to place orders (a fact that is disputed and unclear from the record).[369]  Finally, AWS argues that all Selling Entities were intertwined such that this Court should not disaggregate them.[370]

But the APA, by its terms, *did* disaggregate Goode's companies.  Even if the record is unclear about what (if any) orders came through the website dumpster.me, it *is* clear that Goode's entities had no other assets, bank accounts, employees, etc.  It is easy enough to separate the entities Goode owned on those grounds alone.  Moreover, the record on this point shows that the dumpster.me website was not a

---

[367] *See* Tr. 715:19–716:7 (Arwood) ("[Goode] reached out to me because he knew somebody that had an interest in my portable toilet platform . . . .  They had an interest in buying my portable toilet platform, and I wanted him to facilitate the deal like he did with the Advanced Disposal deals. . . .  He facilitated the deals.").

[368] Tr. 73:7–8 (Goode); JX 114 at 17.

[369] *Compare* Tr. 795:22–796:4 (Arwood) ("Q. Were customer orders—were any customer orders, as far as you know, placed by way of or through Dumpster.Me's website?  A. No, sir.  Q. Was that even possible as far as you know?  A. No, sir."), *with* JX 345 (print out of Dumpster.me webpage handout with the words "order now!"), *and* Tr. 1004:3–15 (Hull) (testifying he "clicked through [the website] to simulate going through the process of placing an order").

[370] *See, e.g.*, Tr. 190:20–191:21 (Mahon) ("I should say that, you know, the P&L that we built was for the entire company, not just the portable toilet business.  Because it became pretty obvious almost immediately that you would not be able to disaggregate the portable toilet business from the rest of the business.").

critical part of the operation, as about 95% of the business came through the call center.[371]

AWS next argues that it is nonsensical Goode would receive $500,000 for transferring a worthless asset, so dumpster.me must have been a critical part of the purchased businesses. But a closer look at the evidence shows that the APA does not provide for consideration to be paid directly to Goode. In fact, it was never contemplated that Goode would receive any compensation under the APA from AWS or Broadtree.[372] Rather, Goode was paid $400,000 directly from Arwood, essentially as payment for facilitating the deal,[373] and another $100,000 that he would then invest into the post-acquisition entity "to be a team player."[374]

---

[371] JX 97 at 18.

[372] Tr. 57:23–58:5 (Goode) ("Q. Did the APA provide for any—I will use the term deal consideration that would flow to you either directly or even indirectly? A. No. No consideration. Q. Did you receive any consideration from Mr. Arwood in connection with your involvement— A. I did.").

[373] Tr. 78:18–19 (Goode) ("Q. You sourced that deal. Correct? A. I was the facilitator, correct.").

[374] Tr. 58:12–18 (Goode).

## 2. Breach of the Implied Covenant

As previously explained, "[t]he implied covenant only applies where a contract lacks specific language governing an issue"[375] to "handle developments or contractual gaps" neither party anticipated.[376]  AWS's implied covenant claim fails as to Goode because it simply does not identify any gap in the APA.  AWS argues that Goode breached the implied covenant because "[i]t is fundamental to the purchase of a business that that business is run legitimately and lawfully."[377]  But Section 3.20 of the APA expressly addressed the lawfulness of the businesses purchased, and Goode did not breach that provision.  The implied covenant claim fails.

## 3. Indemnification

Goode claims he is entitled to indemnification from AWS because (1) he is an indemnified party under the APA, and (2) AWS breached the APA by "making a baseless claim for indemnification against Goode."[378]  Assuming the first point is true, Goode did not issue an indemnification notice to perfect his claim as required

---

[375] *Roma Landmark Theatres, LLC v. Cohen Exhibition Co. LLC*, 2020 WL 58167759, at *10 (Del. Ch. Sept. 30, 2020).

[376] *Nemec*, 991 A.2d at 1125.

[377] DOB at 45.

[378] Third-Party Def.'s [Corrected] Post-Trial Answering Br. (D.I. 207) at 16.

under the APA. Nor has he shown how AWS's pursuit of this litigation caused AWS to breach the APA—meaning, he has not pointed to any "breach of any [] representation, warranty, covenant or agreement by [AWS]," as required to trigger a right to indemnification.[379] Consequently, Goode's claim for indemnification or fees must be rejected.

## F. Damages Against Arwood

While AWS failed to prove its common law fraud claim against Arwood or the Selling Entities, AWS did prove that these sellers breached the APA such that it is entitled to compensatory damages.[380] AWS's claim for breaches of the APA's representations and warranties is subject to a contractual $3.9 million damages cap:

> Except to the extent indemnifiable Losses arise out of (1) fraud, intentional misrepresentation or the intentional breach of a representation, warranty or a covenant . . . , or (2) an inaccuracy or breach of any Fundamental Representation, the maximum amount of Losses . . . shall be Three Million Nine Hundred Thousand Dollars. [381]

---

[379] APA § 7.1(b). Goode's argument that AWS breached Section 7.2(c)(iv) fails because AWS did not purport to assert claims against Goode beyond those identified in Section 7.2(c)(iv).

[380] *See Strassburger v. Earley*, 752 A.2d 557, 579 (Del. Ch. 2000) ("The traditional measure of damages is that which is utilized in connection with an award of compensatory damages, whose purpose is to compensate a plaintiff for its proven, actual loss caused by the defendant's wrongful conduct.").

[381] APA § 7.2(c)(iii)(A).

Because the cap applies, the only question for the Court to decide is whether AWS has proven damages up to the $3.9 million cap. As explained below, it has.

### 1. No Damages for Unproven Claims

I begin with the calculations from the report of Gregory Cowhey, AWS's expert witness. In my view, the report, and supporting testimony, were extensive and generally reliable.[382] Cowhey's report concluded that AWS suffered damages totaling $9,783,013,[383] broken down as follows:

| | Element of Damages | EBITDA Adjustment | EBITDA Multiple | Overstatement in Purchase Price |
|---|---|---|---|---|
| 1 | Disposal (Overage) Revenue | 391,208 | 7.5 | 2,934,061 |
| 2 | Demurrage (Inactivity) Revenue | 301,238 | 7.5 | 2,259,284 |
| 3 | Lien/Lien Removal Revenue | 263,458 | 7.5 | 1,975,933 |
| 4 | Haulers Expenses | 231,085 | 7.5 | 1,733,134 |
| 5 | Replacement Employee Expenses | 41,179 | 7.5 | 308,840 |
| | **Excess Enterprise Value** | **1,228,167** | | **9,211,252** |
| 6 | Excess Loan Origination Fee | | | 27,579 |
| 7 | Excess Loan Interest | | | 377,438 |
| | | | | **9,616,269** |
| 8 | Accounting (Cushnoc) Fees | | | 166,744 |
| | **Total Damages** | | | **9,783,013** |

Although I generally found Cowhey to be a reliable expert, I cannot accept his calculations in their entirety. First, as noted, I reject AWS's contention that

---

[382] JX 284.

[383] *Id.* at 24. Arwood argues I should reject Cowhey's report because he relied on information derived from certain spreadsheets Mahon extracted from TRUX, but as noted, I previously found the TRUX data admissible in this litigation. D.I. 135 (Mot. *in Limine* to Exclude Use of Def.'s TRUX at Trial); D.I. 179 (denying the motion).

Arwood's (partial) failure to disclose his parents as employees resulted in damages to AWS. This reduces AWS's damages by $308,840.

Next, the demurrage damages cannot be included. Arwood points out that AWS attempted to include the allegedly lost demurrage revenue when AWS filed a motion to amend its counterclaims,[384] which was denied.[385] I excluded the evidence regarding demurrage revenue pretrial and sustained objections when AWS attempted to present that evidence during trial.[386] As evidence of demurrage was deemed inadmissible, I do not award those damages, further subtracting $2,259,284 from Cowhey's calculations.

## 2. Damages for Proven Claims

Turning next to Cowhey's calculation of damages relating to overage revenue, lien revenue and unpaid hauler expenses, I accept Cowhey's calculation of damages relating to weight overage revenue and lien revenue, but not the hauler expenses.

As for the overage revenue, Arwood's expert, Brett Margolin, argues that the drop in business reflected in Cowhey's calculation actually was a result of changes

---

[384] PAB at 41; D.I. 158.

[385] D.I. 179.

[386] Tr. 181:11–182:10. I acknowledge that I did allow an expert to testify regarding demurrage as "[h]e was just indicating numbers that he detected in his forensic analysis." Tr. 1357:6–7 (The Court). But I made clear that I was not "in any way revisiting my rulings on the motion to amend or otherwise." Tr. 1357:2–3 (The Court).

in Arwood Waste's portable toilet business, not the dumpster business.[387] But Cowhey points out that Margolin's opinion relies on an arbitrary assumption that the revenue between the portable toilet business and the dumpster business was divided evenly.[388] Because the companies were so intertwined, and it was impossible to disaggregate the two, Cowhey credibly testified, "[y]ou cannot statistically reliably calculate the gross profit margin for either line of business from the compiled financial statements pre-transaction."[389]

---

[387] *See* JX 293 (Margolin Report) at 15 ("[T]he 2019 gross margin compression appears driven *not* by the dumpster business—from which the vast majority of the projected Cowhey Report decline emanates—but the underperformance of the portable toilet business. Further, the underperformance of the portable toilet business in 2019 can explain nearly the entire observed reduction in gross margins."). Margolin also attacks Cowhey's omission of data for August 2019 to December 2019 but, as AWS argues, that data would cause the damages to go up, not down. *See* JX 314. Nor do I agree with Margolin's assertion that Cowhey confuses cash and accrual accounting. *See* DAB at 50–53 (defending Cowhey's method as comparing billing for different periods).

[388] AWS's investor deck estimates a roughly equivalent distribution of gross margins for portable toilets and roll-off dumpsters. JX 311 at 27, 36. Arwood points to various financial reports that suggest that those two lines of businesses was roughly equal. POB at 35 (citing JX 145; JX 163; JX 293; and JX 329). But, as AWS points out, the gross profit margin examination in the Investor Deck does not depict the gross percentage of revenue of AWS as a whole because it is limited to only certain vendors. JX at 36. It is clear from the record that Arwood did not and could not track gross margin by product type.

[389] Tr. 1345:12–15 (Cowhey); JX 163. The inability to disaggregate the businesses also defeats Arwood's argument that "AWS paid just $3 million for the entire dumpster business," pointing to the fact that the first LOI for the purchase of just the portable toilet business contemplated a purchase price of $12 million, while the final LOI for all the Selling Entities was $15.75 million. *See* PTO ¶¶ 63, 69.

That weight overage revenue was more than a small part of the overstated purchase price is supported by Wyner's testimony. When overage data is compared pre-and post-transaction, it shows a significant drop in overages charges.[390] Wyner credibly demonstrated that the average tonnage-billed dropped from about 6.1 to 3.7, and the median tonnage dropped from about 6 to 3.[391] Wyner also found that prior to the acquisition, Arwood Waste entered overages weights for nearly 100% of its customers, but that number decreased to less than 50% post-acquisition.[392] "What the data suggests is that pre-acquisition inflated weights were regularly used and recorded in place of actual measurements and that post-acquisition, these practices were stopped."[393] Wyner's expert testimony proves that the overage revenue was substantial, and I accept Cowhey's calculation that the damages suffered as a result of improper weight overages amounts to $2,934,061.[394]

---

[390] JX 285 at 14.

[391] DAB at 58–60.

[392] JX 285 at 14; DAB at 16–17; Tr. 1050:2–1051:19 (Wyner).

[393] JX 285 at 4.

[394] I note that even though Margolin testified that the drop in revenue could be allocated to a drop in the portable toilet business, JX 293 at 15, his report acknowledged that "available data allows for construction of an alternative damages model which indicates damages of between $2.30 million and $2.15 million." *Id.* at 4, 48. This means that, even if I accepted one of Margolin's alternative calculations of the damages resulting from overages, I would still reach the $3.9 million cap after accounting for lien damages (as discussed below)—

109

As for the damages caused by Arwood Waste's wrongful lien practices, Cowhey opines that AWS suffered almost $2 million in damages caused by Arwood Waste's unlawful lien practices. Arwood and Margolin critique Cowhey's calculation of these damages by arguing that Arwood Waste actually lost money pursuing liens, so there could be no positive EBITDA from imposing liens on customers.[395] In other words, it cost Arwood Waste more money to file liens than Arwood Waste earned in collection.[396]

But, as AWS points out, Arwood Waste charged customers for liens it never filed, so the fees paid to Nationwide Notice do not reliably reflect the breadth of the unlawful lien activity.[397] As discussed above, the preponderance of the evidence proves that Arwood Waste sometimes collected lien fees from customers without actually placing the lien on the project.[398] In my view, Cowhey credibly assessed

$2.15 million in overage damages plus $1,915,933 in lien damages equals $4,065,933, which is above the $3.9 million cap.

[395] Tr. 1285:11–1289:9 (Margolin) (critiquing Cowhey's lien calculation); JX 293 (Margolin Report) at 34–38 (same); *see also* POB at 40–42; PAB at 42.

[396] Tr. 1288:8–24 (Margolin) ("Lien fees for 2017 and all the other years are highly negative. Right? $31,000 in income, maybe in that year; $108,000 in expenses, definitely in that year.").

[397] DAB at 56; JX 293; JX 316.

[398] *See, e.g.*, Tr. 493:18–494:12 (Henley) ("Q. Did Mr. Arwood have any practice involving liening customers? A. Yes. Q. And what was that practice? A. We would lien due to

and calculated damages flowing from illegal lien activity pre-closing, and lien revenue losses multiplied by the agreed-upon EBITDA are awarded to AWS.

I am not persuaded, however, regarding the validity of AWS's hauler expenses damages calculations. Although the record evidence indicates that Arwood sometimes failed to pay haulers, it appears that the parties accounted for unpaid expenses to haulers. Arwood persuasively argues that AWS's alleged payment of $231,000 to haulers for unpaid services is entirely consistent with the Elliott Davis Due Diligence Report, which estimates that the Buyer would have to pay expenses for "accounts payable to vendors [that] approximates $250,000."[399] This suggests that these expenses were known and priced into the acquisition.[400] In any event, for reasons stated, I am not satisfied that AWS proved a breach with respect to unpaid hauler fees. That being said, even without including damages for

---

nonpayment. But there wouldn't always be a lien on the property, necessarily. Q. And what do you mean by that? A. If a customer called in and paid, there was the $495 fee on the account. So in order to reverse that lien, you have to contact our insurance company, which was usually Deb, Michael, or Leeann. But we would find that there wasn't always a lien when they would call Nationwide. Q. And so if you would—what did that indicate to you that was happening with regard to the liens? A. That we may be charging customers for that lien when no lien actually existed.").

[399] JX 132 at 13; JX 293 at 43.

[400] JX 293.

unpaid haulers, AWS has already proven damages that exceed the cap of $3.9 million.

The funds currently in escrow do not reduce the judgment amount, but they do reduce the payout amount.[401] The APA provided for $150,000 to be held in a "Working Capital Escrow Fund" and $1,260,000 to be held back in the "Indemnity Escrow Fund,"[402] totaling $1.41 million in escrow. At the time of closing, AWS also withheld an additional $200,000 in funds as a 'Working Capital Adjustment."[403] After sending Arwood a "Notice of Claims" invoking the indemnification provisions of the APA, AWS instructed the escrow agent not to release any of the escrowed funds to the Selling Entities.[404] Since then, none of the escrowed funds have been released.

According to the APA, the payment of indemnification obligations is to be paid first through the Working Capital Escrow Fund, second through the Indemnity Escrow Fund, and third by the Selling Entities, Arwood and Goode in accordance

---

[401] PTO ¶ 71.

[402] APA § 2.8(b)(iii), (iv); *id.* § 1.1 (definitions); PTO ¶ 71.

[403] PTO ¶ 79.

[404] PTO ¶¶ 91–92.

with any judgment entered against them.[405]  Because of the cap, AWS is entitled to damages in the amount of $3.9 million from Arwood, to be satisfied by payment of the money held in escrow ($1.41 million) and any accrued interest, with the difference to be paid by Arwood and the Selling Entities directly.  AWS is not entitled to fees.[406]  It is, however, entitled to pre- and post-judgment interests at the statutory rate, and prevailing party costs.[407]

## III.   CONCLUSION

For the foregoing reasons, judgment will be entered for Arwood and the Selling Entities on AWS's fraud claim, for Goode on all third-party claims brought

---

[405] APA § 7.2(f)(i); PTO ¶ 76.

[406] As noted, AWS seeks attorneys' fees and costs.  *See* DOB at 56.  "Although Delaware generally adheres to the American Rule for attorneys' fees, in certain instances," including as a matter of contract, or in response to "particularly egregious or fraudulent behavior, attorneys' fees may be awarded as part of a plaintiffs' damages."  *Paron Cap. Mgmt. LLC v. Crombie*, 2012 WL 2045857, at *15 (Del. Ch. May 22, 2012).  As explained above, AWS has not proven its fraud claim.  And, while it is true that, under the APA, "Losses" is defined to include "attorneys,' accountants' and other professionals' fees and expenses," APA § 1.1, "Losses" are also subject to the $3.9 million cap in 7.2(c)(iii)(a), of which AWS is recovering the full amount.  As for a non-contractual basis for fee shifting, AWS has made no effort to demonstrate the sort of egregious behavior that would justify an award of fees under that exception to the American Rule.

[407] *See* 6 *Del. C.* § 2301; *see also* 2 Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 16.09[f][1], at 16-136 (2d ed. 2020) ("[T]he Court of Chancery has the authority to grant pre- and post-judgment interest, and to determine the form of that interest.  The practice of awarding pre-judgment interest is well accepted in Delaware.") (footnote omitted); Ct. Ch. R. 54(d) (allowing for recovery of prevailing party costs).

against him, for AWS on all claims brought against it, and for AWS on its breach of contract claim. AWS is awarded $3.9 million in compensatory damages, to be paid first from the funds held in escrow with the difference to be paid directly by the judgment debtors, plus pre- and post-judgment interest and prevailing party costs. The parties shall confer and submit a proposed implementing final order and judgment within ten (10) days.